In re **HORIZON ORGANIC MILK PLUS DHA OMEGA–3 MARKETING AND SALES PRACTICE LITIGATION.**

**Case No. 12–md–02324.**

United States District Court, S.D. Florida.

July 24, 2013.

Mitchell L. Burgess, Burgess & Lamb, PC, Ralph K. Phalen, The Law Offices of Ralph K. Phalen, PC, Kansas City, MO, Lance August Harke, Harke Clasby & Bushman LLP, Miami Shores, FL, for Plaintiff.

Angela C. Agrusa, Randall J. Sunshine, Liner, Grode, Stein, Yankelevitz, Sunshine, et al., Los Angeles, CA, David Storrs Wood, Akerman Senterfitt, Orlando, FL, Lawrence Dean Silverman, Sandra Jessica Millor, Akerman Senterfitt, Miami, FL, Margaret Diane Mathews, Akerman Senterfitt, Tampa, FL, for Defendants.

*ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINTS, OR IN THE ALTERNATIVE, STRIKE CLASS ALLEGATIONS (D.E. 68), DENYING AS MOOT PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE (D.E. 84), AND DENYING AS MOOT DEFENDANT'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF REPLY BRIEF (D.E. 86)*

JOAN A. LENARD, District Judge.

**THIS CAUSE** is before the Court on Defendant's Motion to Dismiss Plaintiffs'

Amended Complaints Pursuant to F.R.C.P. 12, or, in the Alternative, Strike Class Allegations ("Motion," D.E. 68), filed on August 16, 2012. Plaintiffs filed their Opposition to Defendant's Motion ("Response," D.E. 83) on September 18, 2012, and Defendant filed its Reply in Support of its Motion ("Reply," D.E. 85) on September 28, 2012. Also before the Court is Plaintiffs' Request for Judicial Notice (D.E. 84), filed on September 18, 2012. No response was filed. Also before the Court is Defendant's Request for Judicial Notice in Support of Reply Brief (D.E. 86), filed on September 28, 2012. No response was filed. Having considered the Motion, Response, Reply, Requests for Judicial Notice, and the record, the Court finds as follows.

## I. Background [1]

 Defendant WhiteWave Foods Company ("WhiteWave" or "WFC") is a wholly-owned subsidiary of Dean Foods Company that manufactures, distributes, markets, and sells nationwide five milk products fortified with algae-based DHA Omega–3 ("DHA") under the brand names of "Horizon Organic" and "Silk." [2] The DHA-fortified milk is packaged in cartons with labels that state "DHA Omega–3 Supports Brain Health."

Plaintiffs are consumers from six states (Arizona, Arkansas, California, Florida, Illinois, and Missouri) who purchased the DHA-fortified milk. Plaintiffs filed seven class actions, which have been consolidated and transferred to this Court in this multidistrict litigation ("MDL"),[3] all claiming that Defendant violated state laws by falsely representing on the milk cartons and in advertising that "DHA Omega–3 Supports Brain Health." Plaintiffs argue that Defendant's representation that the DHA in its products "supports brain health" is false and that the competent, scientific evidence shows that Defendant's claim that DHA supports brain health is

---

**1.** The facts alleged in Plaintiffs' complaints are deemed to be true for the purpose of Defendant's Motion to Dismiss. *See Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1057 (11th Cir.2007) (stating that "when ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept all of the plaintiffs well-pleaded facts as true"). The Court notes that in Defendant's Reply (D.E. 85), Defendant makes various arguments regarding the findings of the scientific studies cited in Plaintiffs' complaints. (*See* Reply 6–11.) Defendant also requests that Court take judicial notice of these studies. (*See* Request for Judicial Notice in Support of Reply Brief, D.E. 86.) However, because this case is at the motion to dismiss stage, the Court takes all the well-pleaded facts in Plaintiffs' complaints as true, and the Court does not make any determinations regarding the findings of the scientific studies. Accordingly, Defendant's request for the Court to take judicial notice of those studies is denied as moot.

**2.** The five products are as follows: (1) Horizon Organic Whole Milk plus DHA Omega–3,

(2) Horizon Organic Reduced Fat Milk plus DHA Omega–3, (3) Horizon Organic Fat–Free Milk plus DHA Omega–3, (4) Horizon Organic Chocolate Milk plus DHA Omega–3, and (5) Silk DHA Omega–3 & Calcium All Natural Soy Milk. The Court refers to this group of products as "DHA-fortified milk products."

**3.** The United States Judicial Panel on Multidistrict Litigation transferred to this Court the following actions for centralized pretrial proceedings: *Steven Hulsey v. Dean Foods Company, et al.*, C.A. No. 5:11–05251 (W.D.Ark.), *Evereth Barrera v. Dean Foods, Inc., et al.*, CA. No. 3:11–22049 (S.D.Cal.), *Dr. Brie Gindele, et al. v. Dean Foods, Inc., et al.*, CA. No. 2:11–00600 (M.D.Fla.), *Jamie Walker v. Dean Foods, Inc., et al.*, CA. No. 1:11–06944 (N.D.Ill.), *Colleen Auer, et al. v. Dean Foods Company et al.*, CA. No. 2:12–00865 (D.Ariz.), and *Sarah A. English v. Dean Foods Company et al.*, CA. No. 4:12–cv–00774–DGK (W.D.Mo.). The case of *Michelle Schucher v. Whitewave Foods Company*, CA. No. 1:11–23807 (S.D.Fla.), was already pending in this Court.

false. Plaintiffs further assert that they suffered an economic injury because they all paid a premium price for the DHA-fortified milk products based on Defendant's false representation that DHA supports brain health.

## II. Motion and Response[4]

Defendant moves to dismiss the six amended complaints,[5] arguing that they all fail to state a cognizable claim for relief and fail to meet pleading standards under Rule 9 of the Federal Rules of Civil Procedure for allegedly deceptive conduct. Defendant argues that the amended complaints should all be dismissed for the following six reasons: (1) "private plaintiffs have no standing to bring claims seeking scientific substantiation for a company's labeling or advertising representations," because only federal agencies like the U.S. Food and Drug Administration ("FDA") or the Federal Trade Commission ("FTC") "are authorized to demand substantiation of advertising claims;" (2) "the 'primary jurisdiction doctrine' ... mandates dismissal of these actions in deference to governmental agencies vested with authority over the issues presented;" (3) "inasmuch as FDA and the FTC have already determined that there is enough scientific support for WhiteWave's brain health representation, the claims are not misleading as a matter of law, and are barred by the 'safe harbor' provisions of the consumer protection statutes at issue—which preclude claims based on labels or advertising permitted by FDA or the FTC;" (4) "there is no conceivable way that reasonable consumers could be misled by the conservative claim that DHA Omega–3 'supports' brain health" because "WhiteWave makes no quantified or specific assertions about the benefits of its product, nor does it state that the product is 'assured' to improve brain function or 'clinically proven to increase IQ;'" (5) because "Plaintiffs will be unable to certify classes based on disparate and individualized misrepresentation allegations," all class allegations should be dismissed; and (6) "Plaintiffs lack standing because they cannot show any injury—that is, they cannot show loss of money or property." (Motion 2–3.)

In their Response, Plaintiffs first argue that "WhiteWave's DHA-fortified milk products do *not* support brain health in

**4.** The Parties cite to the *Barrera* Second Amended Complaint for ease of reference, and the Parties note that the same allegations made in the *Barrera* Second Amended Complaint (D.E. 63) are made in the other complaint and amended complaints (D.E. 58, 59, 60, 61, 62) that comprise this MDL.

**5.** On June 27, 2012, Plaintiff Sarah English filed a nearly identical action in a Missouri district court against White Wave, alleging a violation of the Missouri Merchandising Practices Act, breach of express warranty under Missouri law, and a claim of unjust enrichment under Missouri law. *Sarah A. English v. Dean Foods Company et al.*, C.A. No. 4:12–cv–00774–DGK (W.D.Mo.). Defendant filed its Motion to Dismiss on August 16, 2012, prior to the transfer of the *English* action to this Court, and therefore, Defendant's Motion does not address claims raised in the *English* action. Defendant states in its Motion that "[s]hould the *English* action be subsequently transferred to this Court, White Wave respectfully requests permission to raise grounds for its dismissal, consistent with the arguments herein, in the reply brief." (Motion 11 n. 6.) The *English* action was transferred to this Court as a tag-along case to the MDL on August 31, 2012. (*See* D.E. 77.) Defendant filed its reply brief on September 28, 2012, nearly a month after the *English* action was transferred to this Court. Defendant's Reply does not mention the *English* action or address claims raised under Missouri law. (*See generally* Reply.) Accordingly, the Court finds that Defendant has not moved to dismiss the *English* complaint, and because the *English* complaint is the only complaint in this MDL to raise claims under Missouri law, the Court does not address claims brought under Missouri law in this Order.

children or adults" and that because there are "clinical cause-and-effect studies that have found no causative link between DHA algal oil supplementation in milk and brain health," Plaintiffs "have brought claims against WhiteWave for violations of state consumer protection laws, unjust enrichment and breach of warranty." (Response 1–2.) Plaintiffs additionally argue that because the FDA and the FTC's letters regarding WhiteWave's brain health representations "are not a result of an adjudicative enforcement action, they do not provide WhiteWave with a safe harbor from which to escape liability for its violations of law." (*Id.* at 2.) Plaintiffs further argue that Defendant has "mischaracteriz[ed] the complaints as raising failure to substantiate scientific claims," when Plaintiffs are actually asserting that Defendant has made false statements regarding DHA and brain health on its products. (*Id.*) Plaintiffs assert that at this stage in the litigation, their claims of falsity in their complaints, as well as their claims of economic injury, must be taken as true. (*Id.* at 2–3.) Finally, Plaintiffs argue that Defendant's motion to strike the class allegations from the complaints is premature, and "even if the Court were to accept 'the facts' as WhiteWave imagines them to be, several courts including this court, have found similar facts insufficient to defeat certification." (*Id.* at 3.)

## III. Legal Standards

■ The Federal Rules of Civil Procedure generally require a plaintiff to set forth in its complaint a "short and plain statement of his claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d

929 (2007) (citing *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); FED.R.CIV.P. 8(a)(2)). However, in claims involving fraud, "a party must state with particularity the circumstances constituting fraud." FED.R.CIV.P. 9(b). "Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Intern., Inc.,* 256 F.3d 1194, 1202 (11th Cir.2001).

■ In evaluating a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, courts adopt a "two-pronged approach" whereby they first (1) eliminate any allegations in the complaint that are merely legal conclusions and then (2) where there are well-pleaded factual allegations, "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Am. Dental Ass'n v. Cigna Corp.,* 605 F.3d 1283, 1290 (11th Cir.2010) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937.

## IV. Discussion

### A. Plaintiffs' Claims for Relief Under State Law [6]

■ This MDL is comprised of seven class actions, filed by plaintiffs from six

**6.** The Court notes that neither Party provided

the Court with adequate briefing on the laws

different states (Arizona, Arkansas, California, Florida, Illinois, and Missouri). Each case sets forth only state law claims, and each case was filed in federal court under diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). In general, "[f]ederal courts adjudicating state law claims apply the substantive law of the state where they render decisions." *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1059 (11th Cir.2007) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). However, in the MDL setting, "[w]hen considering questions of state law, ... the transferee court must apply the state law that would have applied to the individual cases had they not been transferred for consolidation." *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 97 F.3d 1050, 1055 (8th Cir.1996) (citing *In re Air Crash Disaster Near Chi., Ill.*, 644 F.2d 594, 610 (7th Cir.1981)); *see also Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir.1993) (stating that "under the rule of *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), a transferee court applies the substantive state law, including choice-of-law rules, of the jurisdiction in which the action was filed"); *In re Bldg. Materials Corp. of Am. Asphalt Roofing Shingle Prods. Liab. Litig.*, No. 8:11–mn–02000–JMC, 2013 WL 1827923, at *2 (D.S.C. Apr. 30, 2013) (stating that "[f]or diversity cases that are transferred in a multi-district litigation, the law of the transferor district follows the case to the transferee district"). Accordingly, the Court applies the law of Arizona, Arkansas, California, Florida, and

Illinois[7] to the claims brought by the Plaintiffs from those respective states.

### 1. Consumer Fraud Statutes

Defendant argues that Plaintiffs' claims under their states' consumer fraud statutes all fail because Plaintiffs do not "specifically allege that WhiteWave's representation about its product is actually false, deceptive or misleading." (Motion 25–26.) Defendant also argues that Plaintiffs "lack standing" under the consumer fraud statutes because they have not suffered "any measurable injury or damage." (*Id.* at 33.)

#### a. Arizona Consumer Fraud Act

 Plaintiffs Colleen Auer and Veronica Sisneros bring their first cause of action under the Arizona Consumer Fraud Act. (*See* First Am. Class Action Compl., D.E. 58, ¶¶ 54–64.) The Arizona Consumer Fraud Act ("ACFA") states, in relevant part, as follows:

> The act, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

Ariz.Rev.Stat. Ann. § 44–1522. "The Arizona [Consumer Fraud Act] grants an implied private right of action against persons who violate its provisions." *Raup v. Wells Fargo Bank, NA*, No. CV–13–00137–

of each state. Specifically, the Parties failed to clearly set forth the elements of claims under each state's consumer fraud statutes, and the Parties failed to set forth the elements for breach of express warranty claims and unjust enrichment claims for the applicable

states. The Court directs the Parties to set forth the applicable law in all future briefs.

**7.** The Court does not address any claims brought under Missouri law in this Order. *See supra* note 5.

PHX–GMS, 2013 WL 3216175, at *2 (D.Ariz. June 25, 2013) (citing *Dunlap v. Jimmy GMC of Tucson, Inc.*, 136 Ariz. 338, 666 P.2d 83, 87 (Ariz.Ct.App.1983)). "To succeed on a claim of consumer fraud, a plaintiff must show a false promise or misrepresentation made in connection with the sale or advertisement of merchandise and consequent and proximate injury resulting from the promise." *Kuehn v. Stanley*, 208 Ariz. 124, 91 P.3d 346, 351 (Ariz.Ct.App.2004) (citing *Correa v. Pecos Valley Dev. Corp.*, 126 Ariz. 601, 617 P.2d 767, 771 (Ariz.Ct.App.1980)). "An injury occurs when a consumer relies, even unreasonably, on false or misrepresented information." *Id.* (citing *Correa*, 617 P.2d at 771). "It is not necessary to show specific intent to deceive; the intent to do the act involved is sufficient." *Flagstaff Med. Ctr., Inc. v. Sullivan*, 773 F.Supp. 1325, 1361–62 (D.Ariz.1991) (citing *State ex rel. Babbitt v. Goodyear Tire & Rubber Co.*,

128 Ariz. 483, 626 P.2d 1115, 1118 (Ariz.Ct. App.1981)), *rev'd in part on other grounds*, 962 F.2d 879 (9th Cir.1992).

■ Plaintiffs Auer and Sisneros have satisfied the pleading requirements under Rules 8 and 9(b) of the Federal Rules of Civil Procedure to state a claim under the Arizona Consumer Fraud Act.[8] Plaintiffs allege that WhiteWave's statement that DHA Omega–3 "supports brain health," which WhiteWave placed on the labels of its DHA-fortified milk products and in its advertising of those products, is false and misleading. Specifically, Plaintiffs allege as follows:

> Through an extensive, widespread, comprehensive and uniform nationwide marketing campaign, WFC claims that consuming its premium priced DHA-fortified milk will support brain health in children and adults of all ages. Front and center and prominently fea-

---

8. Defendant argues that Rule 9(b) of the Federal Rules of Civil Procedure, which requires a party alleging fraud to "state with particularity the circumstances constituting fraud," is applicable to Plaintiffs' claims under each state's consumer fraud statutes. (*See* Motion 27–28.) Plaintiffs argue that the pleading requirements of Rule 9(b) do not apply to their claims, and that even if Rule 9(b) did apply, their allegations are sufficient to satisfy the rule's pleading requirements. The Court recognizes that although most courts have found that Rule 9(b) applies to claims brought under states' consumer fraud statutes, other courts have found that Rule 9(b) is not applicable to those claims. *See, e.g., Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir.2009) (stating that Rule 9(b)'s heightened pleading standards apply to claims for violations of California's Consumers Legal Remedies Act and Unfair Competition Law); *McNeil v. Metro. Nat'l Bank*, No. 4:13CV00076 JMM, 2013 WL 2099815, at *2 (E.D.Ark. May 14, 2013) (applying Rule 9(b) to a claim brought under the Arkansas Deceptive Trade Practices Act); *McBride v. Wells Fargo Bank, NA*, No. CV 11–02592–PHX–FJM, 2012 WL 1078467, at *2 (D.Ariz. Mar. 30, 2012) (finding Rule 9(b) applies to

claims brought under the Arizona Consumer Fraud Act); *Costa v. Kerzner Int'l Resorts, Inc.*, No. 11–60663–Civ, 2011 WL 2519244, at *2 (S.D.Fla. June 23, 2011) (finding Rule 9(b) does not apply to claims brought under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")); *Llado–Carreno v. Guidant Corp.*, No. 09–20971, 2011 WL 705403, at *5 (S.D.Fla. Feb. 22, 2011) (finding Rule 9(b) applies to claims brought under the FDUTPA); *Galstaldi v. Sunvest Cmtys. USA, LLC*, 637 F.Supp.2d 1045, 1058 (S.D.Fla.2009) (finding that Rule 9(b) does not apply to claims brought under the FDUTPA). The Court need not resolve the issue because the Court finds that even if Rule 9(b) does apply to Plaintiffs' claims under the consumer fraud statutes, Plaintiffs have satisfied the requirements of Rule 9(b) by pleading their claims with particularity. *See Feiner v. Innovation Ventures LLC*, No. 12–62495–CIV, 2013 WL 2386656, at *4 (S.D.Fla. May 30, 2013) (stating that "[t]he Court need not decide whether the Rule 9(b) standard applies to the FDUTPA claim because Plaintiff has satisfied that standard"). Accordingly, in its analysis of Plaintiffs' claims under the consumer fraud statutes, the Court applies the heightened pleading standard of Rule 9(b).

tured by itself in a banner running across the front of each and every milk carton, WFC states "DHA Omega–3 Supports Brain Health." The brain health representation also prominently appears on the top, the back and the left side panel of every milk carton.

In truth, the DHA-fortified milk products do not support brain health in children or adults. WFC also does not have competent and reliable scientific evidence to support its brain health representation. Clinical cause-and-effect studies have found no causative link between DHA algal oil supplementation and brain health. WFC's brain health representation is false, misleading, and reasonably likely to deceive the public.

. . .

Since the products' launch in 2007, WFC has consistently conveyed the message to consumers throughout the United States, including Arizona, that its DHA-fortified milk products 'support[ ] brain health' in children and adults. They do not. WFC's brain health representation is false, misleading and deceptive.

All of the products WFC manufactures, markets, and sells contain algal DHA. One common type of DHA is a long-chain omega–3 fatty acid typically found in cold water fish. However, the DHA in WFC's milk products is not derived from fish oil. Instead, the DHA oil found in WFC's milk is an immature short-chain Omega–3 fatty acid made from an extract of mutated and fermented algae. Contrary to WFC's representations made in its advertising campaign, including on each and every milk carton, DHA algal oil does not support brain health.

. . .

[C]linical cause and effect studies establish that WFC's brain health representation is false and deceptive.

. . .

WFC did not and does not have competent and reliable scientific evidence that the DHA algal oil in its milk products supports brain health. In fact, competent and reliable scientific studies have found no cause and effect relationship between intake of milk supplemented with DHA algal oil and cognitive development. WFC's brain health representation is false and misleading and reasonably likely to deceive the average customer.

. . .

WFC knew or should have known, but failed to disclose that it had no competent and reliable scientific evidence that its DHA-fortified milk products support brain health and that well conducted, clinical cause-and-effect studies have found not causative link between DHA algal oil supplementation and brain health.

Nonetheless, WFC conveyed and continues to convey one uniform false message: DHA-fortified milk supports brain health in children and adults of all ages.

. . .

Plaintiffs purchased and consumed the products during the relevant time period and in doing so, read and considered the product labels, and based their decision to buy the products on the false brain health representation. WFC's false and misleading brain health representation and omissions were a material factor in influencing Plaintiffs' decision to purchase and consume the products. Plaintiffs would not have purchased the products had they known that WFC's claims were false and misleading, that WFC did not possess competent and reliable scientific evidence to support its brain health representation, and that clinical cause-and-effect studies have found no

causative link between DHA algal oil supplementation and brain health. (First Am. Class Action Compl., D.E. 58, ¶¶ 1, 2, 15, 16, 34, 37, 40–42.) Based on these allegations, the Court finds that Plaintiffs have sufficiently alleged that WhiteWave's representations that DHA Omega–3 "supports brain health" is false or misleading, and that Plaintiffs have explained that this representation is false or misleading by alleging that the DHA-fortified milk products do not support brain health, as shown by clinical cause-and-effect studies that have found no causal link between DHA algal oil and brain health. *See Silvas v. GMAC Mortg., LLC,* No. CV–09–265–PHX–GMS, 2009 WL 4573234, at *7 (D.Ariz. Dec. 1, 2009) (applying Rule 9(b) to the ACFA and stating that "[t]he plaintiff must set forth what is false or misleading about a statement, and why it is false" (quoting *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir.2003))); *see also Ziemba,* 256 F.3d at 1202 (stating that under Rule 9(b) the complaint must set forth "precisely what statements were made in what documents or oral representations ... were made").

Plaintiffs also specify the time and place of each alleged misrepresentation and the party responsible for making the misrepresentations. *See Ziemba,* 256 F.3d at 1202 (stating that under Rule 9(b), the complaint must set forth "the time and place of each such statement and the person responsible for making ... same"). Plaintiffs allege that WhiteWave placed these misrepresentations on the labels of its five DHA-fortified milk products, on its websites, and in its advertisements. (*See* First Am. Class Action Compl., D.E. 58, ¶¶ 1, 10, 11, 16, 18–25, 57, 59, 60.) With regard to the products' labels, Plaintiffs allege that WhiteWave's representation that "DHA Omega–3 Supports Brain Health" "appears on the front and in the center of each carton." (*Id.* ¶¶ 1, 18.) Plaintiffs provide pictures of the front of each of WhiteWave's five DHA-fortified milk products, and the front of each carton states, "DHA Omega–3 Supports *Brain Health."* (*Id.* ¶¶ 14, 18 (emphasis contained in the original labels).) Plaintiffs also allege that the "entire backside of the cartons is similarly dedicated to promoting the DHA algal oil in WFC's products and its purported ability to support brain health," and Plaintiffs include pictures of the back of two milk cartons that contain information about DHA. (*Id.* ¶ 19.) Plaintiffs further allege that the "brain health representation also appears on the top of the Horizon Organic Milk plus DHA Omega–3 cartons," and Plaintiffs provide a picture of the top of a milk carton that states, "Excellent Source of DHA," and "Supports brain, heart, & eye health." (*Id.* ¶ 20.) Plaintiffs additionally allege that the brain health representation appears "on the left-side panel of the Horizon Organic Milk plus DHA Omega–3 cartons, with the added representation that 'DHA may make a big difference for kids and adults alike,'" and Plaintiffs include a picture of the left panel of a milk carton that contains information about DHA. (*Id.* ¶ 21.)

The Complaint also sets forth the time and place the alleged misrepresentations on the milk cartons were made to the named Plaintiffs. Plaintiff Auer alleges that "[f]or approximately six months in 2011, [she] purchased several 1/2 gallon cartons of Horizon Organic Fat–Free Milk plus DHA Omega–3 from a Fry's in Fountain Hills, Arizona," and that "[p]rior to purchasing the product, [she] was exposed to and saw WFC's brain health representation by reading the [product's] label." (*Id.* ¶ 10.) Likewise, Plaintiff Sisneros alleges that "[i]n or around early 2012, [she] purchased several 1/2 gallon cartons of Horizon Organic Whole Milk plus DHA Omega–3 from a Wal–Mart in Phoenix,

Arizona," and that "[p]rior to purchasing the product, [she] was exposed to and saw WFC's brain health representation by reading the [product's] label." (*Id.* ¶ 11.)

With regard to WhiteWave's websites, Plaintiffs provide the addresses for these websites, allege that the websites "contain substantially similar deceptive messages about the ability of the products to support brain health," and include three screenshots of WhiteWave's websites that discuss DHA. (*Id.* ¶¶ 22–23.) With regard to WhiteWave's print advertisements, Plaintiffs allege that "print advertisements claim that Horizon Organic Milk plus DHA Omega–3 supports 'healthy brain development,'" and Plaintiffs provide a picture of the advertisement. (*Id.* ¶ 24.) The Court finds that these allegations regarding misrepresentations in the products' labels, on WhiteWave's websites, and in its print advertisements sufficiently set forth the time, place, and specific content of the alleged false statements and misrepresentations made in connection with the sale or advertisement of WhiteWave's DHA-fortified milk products and sufficiently identify WhiteWave as the party making the alleged false statements and misrepresentations. *See Kuehn*, 91 P.3d at 351 (stating that a "plaintiff must show a false promise or misrepresentation made in connection with the sale or advertisement of merchandise" under the ACFA (citing *Correa*, 617 P.2d at 771)); *see also Frame v. Cal–Western Reconveyance Corp.*, No. CV–11–0201–PHX–JAT, 2011 WL 3876012, at *6 (D.Ariz. Sept. 2, 2011) (finding that the plaintiff failed to state a claim under the ACFA because the complaint did not set forth the time, place, and specific content of the alleged misrepresentations, nor did the complaint identify the parties making the alleged misrepresentation); *Ziemba*, 256 F.3d at 1202.

Plaintiffs also specify the manner in which WhiteWave's false statements misled Plaintiffs by stating that they relied on WhiteWave's statements that DHA supports brain health in purchasing White-Wave's DHA-fortified milk products. *See Ziemba*, 256 F.3d at 1202 (stating that under Rule 9(b), the complaint must set forth "the content of such statements and the manner in which they misled the plaintiff"). Plaintiffs allege that they "purchased [WhiteWave's] DHA-fortified milk products in packages that uniformly stated that the products support brain health" (First Am. Class Action Compl., D.E. 58, ¶ 60), and that they "read and relied on the accuracy of the representations of WFC's advertising and marketing, including the DHA-fortified milk products packaging and labeling, in purchasing the products" (*id.* ¶ 61). Plaintiffs Auer and Sisneros both allege that "[p]rior to purchasing the product, [they were] exposed to and saw WFC's brain health representation by reading the [product's] label," and that "[r]elying on the brain health representation, [they] purchased [one of WhiteWave's DHA-fortified milk products] to the exclusion of other milk products, believing the product supported brain health." (*Id.* ¶¶ 10, 11.)

█ Plaintiffs additionally allege that they were injured by WhiteWave's misrepresentations by "pa[ying] a significant price premium for WFC's DHA-fortified milk products over other comparable products, including WFC's other organic and soy milk products that do not make the deceptive brain health representations." (*Id.* ¶ 4.) Specifically, Plaintiffs allege that "on average, a 1/2 gallon of Horizon Organic Milk plus DHA Omega–3 retails between .20 and .50 cents more than WFC's Horizon Organic Milk without the DHA additive. Similarly, a 1/2 gallon of Silk DHA Omega–3 retails between .20 and .70

cents more than Silk Soy Milk without the DHA additive." (*Id.*) Plaintiffs Auer and Sisneros both allege that they "paid approximately $5.00 for each 1/2 gallon carton" of WhiteWave's DHA-fortified milk products. (*Id.* ¶¶ 10, 11.) Plaintiffs Auer and Sisneros further allege that had they "known the truth about WFC's misrepresentations and omissions, including that there is no scientific evidence to support the brain health representation, [they] would not have purchased and consumed [WhiteWave's DHA-fortified milk products.]" (*Id.* ¶¶ 10, 11.) The Court finds that these allegations sufficiently set forth how WhiteWave's statements regarding brain health misled and injured Plaintiffs by allegedly inducing them to purchase WhiteWave's DHA-fortified milk products to the exclusion of other, less expensive milk products. *See Kuehn,* 91 P.3d at 351 (stating that under the ACFA, "[a]n injury occurs when a customer relies, even unreasonably, on false or misrepresented information" (citing *Correa,* 617 P.2d at 771)); *see also Ziemba,* 256 F.3d at 1202 (stating that under Rule 9(b), the complaint must set forth "the content of [the allegedly false statements] and the manner in which they misled the plaintiff"). Furthermore, by alleging that WhiteWave sold its DHA-fortified milk products at a "significant price premium ... over other comparable products, including [WhiteWave's] other organic and soy milk products that do not make the deceptive brain health representations" (First Am. Class Action Compl., D.E. 58, ¶ 4), the Court finds that Plaintiffs have sufficiently alleged that WhiteWave obtained monetary compensation as a consequence of the alleged fraud. *See Ziemba,* 256 F.3d at 1202 (stating that under Rule 9(b), the complaint must set forth "what the defendants obtained as a consequence of the fraud").

Accordingly, because Plaintiffs have pled all of the elements of a claim under the Arizona Consumer Fraud Act, and because Plaintiffs have satisfied the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure for this claim, the Court finds that Plaintiffs have stated a claim upon which relief may be granted and Defendant's Motion to dismiss this claim is denied.

### b. Arkansas Deceptive Trade Practices Act

Plaintiff Steven Hulsey brings his first cause of action under the Arkansas Deceptive Trade Practices Act. (*See* First Am. Class Action Compl., D.E. 61, ¶¶ 53–64.) Under the Arkansas Deceptive Trade Practices Act ("ADTPA"),

(a) Deceptive and unconscionable trade practices made unlawful and prohibited by this chapter include, but are not limited to, the following:

(1) Knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services or as to whether goods are original or new or of a particular standard, quality, grade, style, or model;

. . .

(10) Engaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]

ARK.CODE ANN. § 4–88–107(a)(1), (10). In addition, with regard to advertising, the ADTPA states as follows:

When utilized in connection with the sale or advertisement of any goods, services, or charitable solicitation, the following shall be unlawful:

(1) The act, use, or employment by any person of any deception, fraud, or false pretense; or

(2) The concealment, suppression, or omission of any material fact with intent

that others rely upon the concealment, suppression, or omission.

ARK.CODE ANN. § 4–88–108. "The ADTPA provides a private cause of action to '[a]ny person who suffers actual damage or injury as a result of an offense or violation as defined in this chapter.'" *DePriest v. AstraZeneca Pharm., L.P.,* 351 S.W.3d 168, 173 n. 4 (Ark.2009) (quoting Ark.Code Ann. § 4–88–113(f)). "By allowing for recovery only when the injury is 'a result of' an ADTPA violation, [the ADTPA] necessarily includes a proximate cause element." *Ashley Cnty., Ark. v. Pfizer, Inc.,* 552 F.3d 659, 666 (8th Cir.2009) (quoting Ark.Code Ann. § 4–88–113(f)) (citing *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 456–57, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006)). "In Arkansas, proximate cause is 'defined as that which in a natural and continuous sequence, unbroken by any efficient intervening cause, produced the injury, and without which the result would not have occurred.'" *Id.* at 666–67 (quoting *City of Caddo Valley v. George,* 340 Ark. 203, 9 S.W.3d 481, 487 (2000)). Liability under Section 4–88–107(a)(1) "require[s] that the defendant knowingly and intentionally engage in a deceptive trade practice," whereas liability under Sections "4–88–107(a)(10) and 4–88–108(2) do not require knowing or intentional deception." *Curtis Lumber Co., Inc. v. La. Pac. Corp.,* 618 F.3d 762, 776 (8th Cir.2010).

 Plaintiff Hulsey has stated a claim under the Arkansas Deceptive Trade Practices Act. Like Plaintiffs Auer and Sisneros, Plaintiff Hulsey alleges that WhiteWave made false statements or misrepresentations that DHA "supports brain health" in connection with the sale and advertisement of its DHA-fortified milk products. (*See* First Am. Class Action Compl., D.E. 61, ¶¶ 1, 2, 14, 15, 33, 36, 39–41.) Plaintiff specifies the time and place of each alleged misrepresentation and the party responsible for making the misrepresentations by alleging that WhiteWave placed these misrepresentations on the labels of its five DHA-fortified milk products, on its websites, and in its advertisements. (*See id.* ¶¶ 1, 10, 15–24, 57, 59, 61.) The Complaint also sets forth the time and place the alleged misrepresentations on the milk cartons were made to the named Plaintiff. Plaintiff Hulsey alleges that "[b]eginning in approximately April of 2011, [he] purchased and consumed, along with his wife and children, Horizon Organic Milk plus DHA Omega–3" from "Wal-Mart Supercenters and Neighborhood Markets in … Fayetteville, Arkansas," and that "[p]rior to purchasing the product, [he] was exposed to and saw WFC's brain health representation by reading the Horizon Organic Milk plus DHA Omega–3 label, as well as WFC's other advertisements, including print and television advertising." (*Id.* ¶ 10.) Plaintiff also alleges the manner in which WhiteWave's false statements misled him by stating that he relied on WhiteWave's statements on the milk carton labels and in its advertisements that DHA supports brain health in purchasing WhiteWave's DHA-fortified milk products to the exclusion of other milk products and that "[h]ad [he] known that WFC's misrepresentations and omissions, including that WFC's did not possess competent scientific evidence to support the brain health representations, he would not have purchased and consumed Horizon Organic Milk plus DHA Omega–3." (*Id.*) Finally, Plaintiff alleges that he has been economically injured and that WhiteWave received monetary compensation as a result of its misrepresentation by alleging that Plaintiff "has paid a significant price premium for WFC's DHA-fortified milk products over other comparable products, including WFC's other organic and soy milk products that do not make the deceptive brain health representa-

tions." (*Id.* ¶ 4.) Accordingly, because Plaintiff sufficiently pled a claim under the Arkansas Deceptive Trade Practices Act, Defendant's Motion to dismiss this claim is denied.

### c. California's Unfair Competition Law and Consumers Legal Remedies Act

▮▮▮▮ Plaintiff Evereth Barrera brings his first cause of action under California's Unfair Competition Law ("UCL"). (*See* Second Am. Class Action Compl., D.E. 63, ¶¶ 53–66.) California's UCL prohibits engaging in "unfair competition," which is defined, *inter alia,* as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."[9] CAL. BUS. & PROF.CODE § 17200; *see also Elias v. Hewlett–Packard Co.,* 950 F.Supp.2d 1123, No. 12–CV–00421–LHK, 2013 WL 3187319, at *7 (N.D.Cal. June 21, 2013) (stating that the UCL's "coverage has been described as 'sweeping,' and its standard for wrongful business conduct is 'intentionally

broad'" (quoting *In re First Alliance Mortg. Co.,* 471 F.3d 977, 995 (9th Cir. 2006))). A private person who "'has suffered injury in fact and has lost money or property as a result of such unfair competition'" may bring suit for a violation of the UCL. *Californians for Disability Rights v. Mervyn's, LLC,* 39 Cal.4th 223, 46 Cal.Rptr.3d 57, 138 P.3d 207, 210 (2006) (quoting CAL. BUS. & PROF.CODE § 17204, *as amended by* Prop. 64, § 3) (citing Cal. Bus. & Prof.Code § 17203, *as amended by* Prop. 64, § 2). "A plaintiff must: (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, *i.e., economic injury,* and (2) show that that economic injury was the result of, *i.e., caused by,* the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Superior Court,* 51 Cal.4th 310, 120 Cal.Rptr.3d 741, 246 P.3d 877, 885 (2011). In other words, "plaintiffs who can truthfully allege they were deceived by a product's label into spending money to purchase the product,

---

9. Courts have noted that "[b]ecause the law is disjunctive" by prohibiting any "unlawful, unfair, *or* fraudulent business act or practice," "a separate and distinctive claim can be brought under each prong." *Aguilar v. Boulder Brands, Inc.,* No. 12cv01862 BTM (BGS), 2013 WL 2481549, at *4 (S.D.Cal. June 10, 2013) (emphasis added) (citing *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1127 (9th Cir. 2009)). "To state a claim under the "unlawful" prong of the UCL, the Plaintiff must allege a violation of another law," and "[t]he UCL borrows violations from virtually any state, federal, or local law," including California's Consumers Legal Remedies Act ("CLRA"). *Id.* (citing *Davis v. HSBC Bank Nev., N.A.,* 691 F.3d 1152, 1168 (9th Cir. 2012); *Cel–Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,* 20 Cal.4th 163, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999)). Here, Plaintiff Barrera states a claim under the "unlawful" prong of the UCL by alleging that WhiteWave committed unlawful business practices by, *inter alia,* violating the CLRA. (*See* Second Am. Class Action Compl., D.E. 63, ¶ 55.)

Plaintiff Berrera also alleges that White-Wave committed "'unfair' business acts or practices" under the UCL by "engag[ing] in false advertising, misrepresent[ing] and omitt[ing] material facts regarding its DHA-fortified milk products." (*Id.* ¶¶ 57, 58.) "California courts have yet to determine the proper definition of 'unfair' as it pertains to UCL claims brought by consumers." *Aguilar,* 2013 WL 2481549, at *4 n. 1 (citing *Lozano v. AT & T Wireless Servs.,* 504 F.3d 718, 736 (9th Cir. 2007)). "One line of decisions requires the court to weigh the defendant's conduct against the harm to the victim, while the other tethers 'unfair' to a specific constitutional, statutory, or regulatory provision." *Id.* (citing *Davis,* 691 F.3d at 1170). At this stage in the litigation, the Court need not decide whether Plaintiff has properly alleged a claim under the "unfair" prong of the UCL because Plaintiff has alleged facts necessary to establish a claim under the UCL by satisfying the "unlawful" prong.

and would not have purchased it otherwise, ... have standing to sue." *Id.*, 120 Cal. Rptr.3d 741, 246 P.3d at 881.

Plaintiff Barrera brings his second cause of action under California's Consumers Legal Remedies Act ("CLRA"). (*See* Second Am. Class Action Compl., D.E. 63, ¶¶ 67–73.) "Like the UCL, the CLRA prohibits 'unfair methods of competition and unfair or deceptive acts or practices.'" *McKinnon v. Dollar Thrifty Auto. Grp., Inc.,* No. 12–4457 SC, 2013 WL 3357929, at *6 (N.D.Cal. July 3, 2013) (quoting CAL CIV. CODE § 1770). The CLRA deems "unlawful" the following acts that are "undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer":

> (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have.
>
> . . .
>
> (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.
>
> . . .
>
> (9) Advertising goods or services with intent not to sell them as advertised.
>
> . . .
>
> (16) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

CAL. CIV.CODE § 1770(a). "[U]nder the CLRA, a [p]laintiff must claim she was damaged by an alleged unlawful practice." *Aguilar v. Boulder Brands, Inc.,* No. 12cv01862 BTM (BGS), 2013 WL 2481549, at *2 (S.D.Cal. June 10, 2013) (citing *Meyer v. Sprint Spectrum L.P.,* 45 Cal.4th 634, 88 Cal.Rptr.3d 859, 200 P.3d 295 (2009)). "The standard for claims [under the CLRA and the UCL] is the 'reasonable consumer' test, which requires a plaintiff to show that members of the public are likely to be deceived by the business practice or advertising at issue." *Kosta v. Del Monte Corp.,* No. 12–cv–01722–YGR, 2013 WL 2147413, at *12 (N.D.Cal. May 15, 2013) (citing *Williams v. Gerber Prods.,* 552 F.3d 934, 938 (9th Cir.2008)).

■ Plaintiff Barrera has stated claims under California's Unfair Competition Law and Consumers Legal Remedies Act. Like Plaintiffs Auer and Sisneros, Plaintiff Barrera alleges that WhiteWave falsely claimed that DHA "supports brain health" in connection with the sale and advertisement of its DHA-fortified milk products. (*See* Second Am. Class Action Compl., D.E. 63, ¶¶ 1, 2, 14, 15, 33, 36, 37, 39–42.) The allegedly false statement on the milk cartons' labels that DHA "supports brain health" is sufficient to support a claim for a violation of Section 1770(a)(5) of the CLRA, which prohibits representing that a product has certain characteristics, uses, and benefits which it does not have, because Plaintiff has alleged that the algal DHA in WhiteWave's DHA-fortified milk products does not support brain health. *See Aguilar,* 2013 WL 2481549, at *1, *5 (finding that where a butter product's "label state[d] that the addition of plant sterols in the spread 'Helps Block Cholesterol in the Butter,'" the plaintiff "adequately pled a misrepresentation of the [p]roduct" under subsection 5 of the CLRA by alleging that "the amount of plant sterols in a single serving are insufficient to provide the benefit of blocking the cholesterol in the butter"). In addition, Plaintiff specifies the time and place of each alleged misrepresentation and the party responsible for making the misrepresentations by alleging that WhiteWave placed these mis-

representations on the labels of its five DHA-fortified milk products, on its websites, and in its advertisements. (*See id.* ¶¶ 1, 3, 10, 15–24, 55, 57, 69, 70.) The Complaint also sets forth the time and place the alleged misrepresentations on the milk cartons were made to the named Plaintiff. Plaintiff Barrera alleges that "[b]etween approximately July and August 2011, [he] purchased approximately three 1/2 gallon cartons of Horizon Organic Reduced Fat Milk plus DHA Omega–3 from Von's in El Centro, California," and that "[p]rior to purchasing the product, [he] was exposed to and saw WFC's brain health representation by reading the Horizon Organic Reduced Fat Milk plus DHA Omega–3 label." (*Id.* ¶ 10.) Plaintiff also alleges the manner in which WhiteWave's false statements misled him by stating that he relied on WhiteWave's statements on the milk carton labels that DHA supports brain health in purchasing WhiteWave's DHA-fortified milk products to the exclusion of other milk products and that "[h]ad [he] known the truth about WFC's misrepresentations and omissions, including that there is no scientific evidence to support the brain health representation, he would not have purchased and consumed Horizon Organic Reduced Fat Milk plus DHA Omega–3." (*Id.*) Finally, Plaintiff alleges that he has been economically injured and that WhiteWave received monetary compensation as a result of its misrepresentations by alleging that Plaintiff "has paid a significant price premium for WFC's DHA-fortified milk products over other comparable products, including WFC's other organic and soy-milk products that do not make the deceptive brain health representation." (*Id.* ¶ 4.) Allegations that a plaintiff paid a premium for a product that the plaintiff would not have paid but for the maker's misrepresentation are sufficient to allege economic injury and standing under the CLRA and UCL. *See Kosta,*

2013 WL 2147413, at *12 (stating that "Plaintiffs allege they paid a premium for Del Monte's products which they otherwise would not have paid but for Del Monte's misrepresentations" and finding that "Plaintiffs have alleged economic injury resulting from Del Monte's alleged unfair competition and false advertising"). Accordingly, because Plaintiff sufficiently pled claims under California's Unfair Competition Law and Consumers Legal Remedies Act, Defendant's Motion to dismiss these claims is denied.

#### d. Florida Deceptive and Unfair Trade Practices Act

 Plaintiffs Michelle Schucher, Brie Gindele, and Wendy Wilson bring their first cause of action under the Florida Deceptive and Unfair Trade Practices Act. (*See* First Am. Class Action Compl., D.E. 59, ¶¶ 52–61; First Am. Class Action Compl., D.E. 62, ¶¶ 53–62.) The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") states, "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." FLA. STAT. § 501.204(1). "[A]ny person who has suffered losses as a result of a violation may commence a private action to recover actual damages, attorney's fees, and costs." *Zlotnick v. Premier Sales Grp., Inc.,* 480 F.3d 1281, 1284 (11th Cir. 2007) (citing FLA. STAT. § 501.211(2)). "Although not specifically identified in the statute, there are three elements that are required to be alleged to establish a claim pursuant to the FDUTPA: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *KC Leisure, Inc. v. Haber,* 972 So.2d 1069, 1073 (Fla.Dist.Ct. App.2008). " '[D]eception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting

reasonably in the circumstances, to the consumer's detriment.'" *Zlotnick,* 480 F.3d at 1284 (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.,* 842 So.2d 773, 777 (Fla. 2003)). "This standard requires a showing of 'probable, not possible deception' that is 'likely to cause injury to a reasonably relying consumer.'" *Id.* (quoting *Millennium Commc'ns & Fulfillment, Inc. v. Office of the Att'y Gen.,* 761 So.2d 1256, 1263 (Fla. Dist.Ct.App.2000)).

 Plaintiffs Schucher, Gindele, and Wilson have stated claims under the Florida Deceptive and Unfair Trade Practices Act. Like Plaintiffs Auer and Sisneros, Plaintiffs Schucher, Gindele, and Wilson allege that WhiteWave made false statements or misrepresentations that DHA "supports brain health" in connection with the sale and advertisement of its DHA-fortified milk products. (*See* First Am. Class Action Compl., D.E. 59, ¶¶ 1, 2, 13, 14, 35–39, 58; First Am. Class Action Compl., D.E. 62, ¶¶ 1, 2, 14, 15, 33, 36, 39–41, 59.) Plaintiffs specify the time and place of each alleged misrepresentation and the party responsible for making the misrepresentations by alleging that White-Wave placed these misrepresentations on the labels of its five DHA-fortified milk products, on its websites, and in its advertisements. (*See* First Am. Class Action Compl., D.E. 59, ¶¶ 1, 3, 15–23, 40, 58; First Am. Class Action Compl., D.E. 62, ¶¶ 1, 3, 9, 10, 15–24, 41, 59.) The Complaints also set forth the time and place the alleged misrepresentations on the milk cartons were made to the named Plaintiffs. Plaintiff Schucher alleges that "[b]eginning in 2010, [she] purchased multiple 1/2 gallon cartons of Silk DHA Omega–3 & Calcium Milk at Publix and Whole Foods markets in Miami–Dade County," and that "[p]rior to purchasing the product, [she] was exposed to and saw WFC's brain health representation by reading the Silk DHA Ome-

ga–3 Milk label." (First Am. Class Action Compl., D.E. 59, ¶ 9.) Plaintiff Gindele alleges that "[b]eginning in and throughout 2010, [she] purchased and consumed Horizon Organic Milk plus DHA Omega–3," which she "regularly purchased . . . at Public supermarkets in Fort Myers, Florida," and that "[p]rior to purchasing these products, [she] was exposed to and saw WFC's brain health representation by reading the Horizon Organic Milk plus DHA Omega–3 label, as well as other advertisements, including internet and print advertising." (First Am. Class Action Compl., D.E. 62, ¶ 9.) Plaintiff Wilson alleges that "[f]rom approximately 2007 through 2010, [she] purchased and consumed Horizon Organic Milk plus DHA Omega–3," which she "regularly purchased . . . at Publix and Wal–Mart supermarkets in the Tampa Bay, Florida area," and that "[p]rior to purchasing these products, [she] was exposed to and saw WFC's brain health representation by reading the Horizon Organic Milk plus DHA Omega–3 label, as well as other advertisements, including print and television advertising." (*Id.* ¶ 10.) Plaintiffs' allegations that WhiteWave represents on its products' labels and in its advertising that the DHA in its products "supports brain health" when the DHA in its products actually do not support brain health are sufficient to allege a "deceptive act" under the FDUTPA because these alleged misrepresentations are likely to mislead a reasonable customer into believing that the DHA in White-Wave's products supports brain health. *See Feiner v. Innovation Ventures LLC,* No. 12–62495–CIV, 2013 WL 2386656, at *3 (S.D.Fla. May 30, 2013) (finding that the plaintiff's allegations that "the product's name 5–hour ENERGY, as displayed on the bottle, coupled with the statements 'Hours of Energy now—No crash later,' 'Sugar free,' 'Feel it in minutes,' and 'Lasts for Hours,' presents a message that just

two ounces of the Product will provide five hours of sustained energy within minutes, without a negative 'crash' side effects later," coupled with the allegation that "these representations are not true," were sufficient to allege a deceptive act under the FDUTPA). Plaintiffs also allege the manner in which WhiteWave's false statements misled them by stating that they relied on WhiteWave's statements on the milk carton labels and in its advertisements that DHA supports brain health in purchasing WhiteWave's DHA-fortified milk products to the exclusion of other milk products and that "[h]ad [they] known the truth about WFC's misrepresentations and omissions, including that there was no scientific evidence to support the brain health representation, [they] would not have purchased and consumed [the DHA-fortified milk products]." (First Am. Class Action Compl., D.E. 59, ¶ 9; First Am. Class Action Compl., D.E. 62, ¶¶ 9, 10.) Finally, Plaintiffs allege that they have been economically injured and that WhiteWave received monetary compensation as a result of its misrepresentations by alleging that Plaintiffs have "paid a significant price premium for [White-Wave's] DHA-fortified milk products over other comparable products, including [WhiteWave's] other organic and soy milk products that do not make the deceptive brain health representations." (First Am. Class Action Compl., D.E. 59, ¶ 4; First Am. Class Action Compl., D.E. 62, ¶ 4.) Plaintiffs' allegations that they relied on WhiteWave's representations when buying the DHA-fortified milk products, that they would not have purchased the products but for WhiteWave's misrepresentations, and that they were damaged in the amount of the difference between the premium price paid for the DHA-fortified milk products and the price they would have paid for other milk products are sufficient to allege causation and damages under the FDUT-

PA. *See Feiner*, 2013 WL 2386656, at *3 (finding that the plaintiff's allegations that "he purchased 5–hour ENERGY instead of other similar products in reliance on Defendant's deceptive representations, would not have purchased the 5–hour ENERGY had he known that the representations were false, and has been damaged in the amount of the difference between the premium price paid for the Product and the price they would have paid had they known that the Product was not fit when consumed" were sufficient to allege causation and damages under the FDUTPA). Accordingly, because Plaintiffs sufficiently pled a claim under the Florida Deceptive and Unfair Trade Practices Act, Defendant's Motion to dismiss this claim is denied.

### e. Illinois Consumer Fraud Act

Plaintiff Jamie Walker brings her first cause of action under the Illinois Consumer Fraud Act ("ICFA"). (*See* Second Am. Class Action Compl., D.E. 60, ¶¶ 53–62.) To state a claim under the ICFA, a plaintiff must allege:

(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception.

*De Bouse v. Bayer*, 235 Ill.2d 544, 337 Ill.Dec. 186, 922 N.E.2d 309, 313 (2009) (citing *Zekman v. Direct Am. Marketers, Inc.*, 182 Ill.2d 359, 231 Ill.Dec. 80, 695 N.E.2d 853 (1998)). "[T]o maintain an action under the Act, the plaintiff must actually be deceived by a statement or omission that is made by the defendant." *Id.*, 337 Ill.Dec. 186, 922 N.E.2d at 316. "Illinois courts have stated that the seller's intent to deceive (or lack thereof) is imma-

terial for a claim under the ICFA because innocent misrepresentations are also actionable." *Curtis Lumber,* 618 F.3d at 777 (citing *Cripe v. Leiter,* 184 Ill.2d 185, 234 Ill.Dec. 488, 703 N.E.2d 100, 103 (1998); *Duhl v. Nash Realty Inc.,* 102 Ill.App.3d 483, 57 Ill.Dec. 904, 429 N.E.2d 1267, 1277 (1981)). In addition, "[t]hat the plaintiff must prove that actual damages were suffered 'as a result' of the deceptive act imposes an obligation on the plaintiff to prove the deceptive act proximately caused any damages." *De Bouse,* 337 Ill.Dec. 186, 922 N.E.2d at 313 (citing *Oliveira v. Amoco Oil Co.,* 201 Ill.2d 134, 267 Ill.Dec. 14, 776 N.E.2d 151 (2002)).

■■ Plaintiff Walker has stated a claim under the Illinois Consumer Fraud Act. Like Plaintiffs Auer and Sisneros, Plaintiff Walker alleges that WhiteWave made false statements or misrepresentations that DHA "supports brain health" in connection with the sale and advertisement of its DHA-fortified milk products. (*See* Second Am. Class Action Compl., D.E. 60, ¶¶ 1, 2, 14, 15, 33, 36, 39–41.) Plaintiff specifies the time and place of each alleged misrepresentation and the party responsible for making the misrepresentations by alleging that WhiteWave placed these misrepresentations on the labels of its five DHA-fortified milk products, on its websites, and in its advertisements. (*See id.* ¶¶ 1, 3, 10, 16–24, 55, 58.) The Complaint also sets forth the time and place the alleged misrepresentations on the milk cartons were made to the named Plaintiff. Plaintiff Walker alleges that "[d]uring 2011, [she] purchased several 1/2 gallon cartons of Horizon Organic Fat–Free Milk plus DHA Omega–3 from Brookhaven and Target in Mokena, Illinois," and that "[p]rior to purchasing the product, [she] was exposed to and saw WFC's brain health representation by reading the Horizon Organic Fat–Free Milk plus DHA Omega–3 label." (*Id.* ¶ 10.) Plaintiff also alleges the manner in

which WhiteWave's false statements misled her by stating that she relied on WhiteWave's statements on the milk carton labels and in its advertisements that DHA supports brain health in purchasing White-Wave's DHA-fortified milk products to the exclusion of other milk products and that "[h]ad [she] known the truth about WFC's misrepresentations and omissions, including that there is no scientific evidence to support the brain health representation, she would not have purchased and consumed Horizon Organic Fat–Free Milk plus DHA Omega–3." (*Id.*) Finally, Plaintiff alleges that she has been economically injured and that WhiteWave received monetary compensation as a result of its misrepresentation by alleging that Plaintiff "has paid a significant price premium for WFC's DHA-fortified milk products over other comparable products, including WFC's other organic and soy milk products that do not make the deceptive brain health representation." (*Id.* ¶ 4.) Accordingly, because Plaintiff sufficiently pled a claim under the Illinois Consumer Fraud Act, Defendant's Motion to dismiss this claim is denied.

### 2. Unjust Enrichment Claims

Defendant argues that Plaintiffs Auer, Sisneros, Hulsey, Schucher, Gindele, and Wilson's claims for unjust enrichment all "fail because they cannot show that they conferred a benefit on WhiteWave and that under the circumstances, it would be inequitable for the defendant to retain the benefit without paying for it." (Motion 39 (quotation omitted).) Defendant also argues that these unjust enrichment claims should be dismissed "because they do not plead that they lack an adequate legal remedy." (*Id.*)

#### a. Arizona

■■ Plaintiffs Auer and Sisneros allege an unjust enrichment claim under

Arizona law. (*See* First Am. Class Action Compl., D.E. 58, ¶¶ 71–76.) Under Arizona law, " '[t]o recover on a theory of unjust enrichment, [a plaintiff] must allege and prove that [a defendant] acquired the money under circumstances which renders [the defendant's] retention of the money inequitable.' " *Burge v. Freelife Int'l, Inc.*, No. CV 09–1159–PHX–JAT, 2009 WL 3872343, at *4 (D.Ariz. Nov. 18, 2009) (quoting *Johnson v. Am. Nat. Ins. Co.*, 126 Ariz. 219, 613 P.2d 1275, 1279 (Ariz.Ct. App.1980)). "The elements of unjust enrichment are '(1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) absence of a justification for the enrichment and the impoverishment; and (5) an absence of a remedy provided by law.' " *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1009 (9th Cir.2010) (quoting *Cmty. Guardian Bank v. Hamlin*, 898 P.2d 1005, 1008 (Ariz.Ct.App.1995)). Regarding the absence of a legal remedy, "this element has been applied to preclude recovery under an unjust enrichment claim where there is an express contract that governs the relationship between the parties." *Burge*, 2009 WL 3872343, at *5 (citing *Brooks v. Valley Nat'l Bank*, 113 Ariz. 169, 548 P.2d 1166, 1171 (1976); *Trustmark Ins. Co. v. Bank One, Ariz., NA*, 202 Ariz. 535, 48 P.3d 485, 492 (Ariz.Ct.App.2002); *Johnson*, 613 P.2d at 1279; *Ashton Co., Inc., Contractors & Eng'rs v. State*, 9 Ariz. App. 564, 454 P.2d 1004, 1010 (1969)).

■ Plaintiffs have stated a claim for unjust enrichment under Arizona law. Plaintiffs allege as follows:

Plaintiffs and Class members conferred upon WFC non-gratuitous payments for the DHA-fortified milk products. WFC appreciated, accepted or retained the non-gratuitous benefits conferred by Plaintiffs and Class members, with full knowledge and awareness that, as a result of WFC's deceptive marketing, Plaintiffs and Class members paid a price premium for DHA-fortified milk but did not receive DHA-fortified milk products of the quality, nature, fitness or value that had been represented by WFC. It would be inequitable and unjust for WFC to retain these wrongfully obtained profits. There is no justification for Plaintiffs' and the Class' impoverishment and WFC's related enrichment.

. . .

Plaintiffs and the Class have no adequate remedy at law[.]

(First Am. Class Action Compl., D.E. 58, ¶¶ 74, 76.) Plaintiffs' allegations that they purchased and consumed WhiteWave's DHA-fortified milk products based upon the WhiteWave's false representation that the DHA in its products "supports brain health," that WhiteWave retained the payment, and that there was no justification for WhiteWave's enrichment and Plaintiffs' impoverishment due to WhiteWave's misrepresentations, are sufficient to allege the first four elements of an unjust enrichment claim under Arizona law. *See Burge*, 2009 WL 3872343, at *5 (finding that the plaintiffs "satisfied the first four elements in an unjust enrichment claim by alleging that they purchased and consumed [the defendant's] products based upon representations that were false" because these allegations showed that the defendant "received enrichment and Plaintiffs impoverishment by paying value for a product the effects of which were fraudulently misrepresented and, based upon these misrepresentations, there is no justification for [the defendant's] enrichment and Plaintiffs' impoverishment"). Finally, Plaintiffs have pled that there is no adequate legal remedy (*see* First Am. Class Action Compl., D.E. 58, ¶ 76), and Defendant does not argue that there is an express contract between the

parties that precludes recovery under an unjust enrichment theory (*see* Motion 39–40). Accordingly, because Plaintiffs sufficiently pled an unjust enrichment claim under Arizona law, Defendant's Motion to dismiss this claim is denied.

### b. Arkansas

 Plaintiff Hulsey alleges an unjust enrichment claim under Arkansas law. (*See* First Am. Class Action Compl., D.E. 61, ¶¶ 65–71.) Under Arkansas law, "[t]o find unjust enrichment, a party must have received something of value, to which he was not entitled and which he must restore." *Varner v. Peterson Farms*, 371 F.3d 1011, 1018 (8th Cir.2004) (citing *Guar. Nat. Ins. Co. v. Denver Roller, Inc.*, 313 Ark. 128, 854 S.W.2d 312, 317 (1993)). "It is not enough . . . to establish a benefit received by another party;" instead, " '[t]here must also be some operative act, intent, or situation to make the enrichment unjust and compensable.' " *Ashley Cnty., Ark.*, 552 F.3d at 665 (quoting *Dews v. Halliburton Indus., Inc.*, 288 Ark. 532, 708 S.W.2d 67, 69 (1986)); *see also Day v. Case Credit Corp.*, No. 5:01CV00304–WRW, 2007 WL 604636, at *3 (E.D.Ark. Feb. 22, 2007) (stating that "the enrichment must have come about from unjust events or motives"). However, "[c]ourts in Arkansas do not require a tortious, illegal or fraudulent act by the defendant to prove unjust enrichment." *Thompson v. Bayer Corp.*, No. 4:07CV00017 JMM, 2009 WL 362982, at *4 (E.D.Ark. Feb. 12, 2009) (citing *Frigillana v. Frigillana*, 266 Ark. 296, 584 S.W.2d 30 (1979)). "The measure of damages for unjust enrichment is the amount of unfair gain received by those unjustly enriched." *Klein v. Arkoma Prod. Co.*, 73 F.3d 779, 786 (8th Cir.1996) (citing *Holland v. Walls*, 3 Ark.App. 20, 621 S.W.2d 496, 499 (1981)).

Plaintiff Hulsey has stated a claim for unjust enrichment under Arkansas law. Plaintiff alleges as follows:

> Plaintiff and the Arkansas Class have conferred a benefit upon Defendant by purchasing Horizon Organic Milk with DHA Omega–3 at a significant premium, as opposed to less expensive milk, organic or otherwise, that did not contain the additive.

> By its deceptive, misleading and unlawful conduct alleged herein, Defendant has unjustly received and retained a benefit at the expense of Plaintiff and Arkansas Class members.

> Under principles of equity and good conscience, WFC should not be permitted to retain money belonging to Plaintiff and the Arkansas Class that it unjustly received as a result of its deceptive, misleading and unlawful conduct alleged herein without providing compensation to Plaintiff and Arkansas Class members.

> Plaintiff and the Arkansas Class have suffered financial loss as a direct result of WFC's conduct.

(First Am. Class Action Compl., D.E. 61, ¶¶ 67–70.) Plaintiff's allegation that WhiteWave received money from Plaintiff (measured by the difference in price of its DHA-fortified milk and its milk products that do not contain DHA), to which White-Wave was not entitled because it misrepresented that the DHA-fortified milk products "support brain health," is sufficient to state a claim for unjust enrichment under Arkansas law. *See Varner*, 371 F.3d at 1018; *Ashley Cnty., Ark.*, 552 F.3d at 665. Accordingly, because Plaintiff sufficiently pled an unjust enrichment claim under Arkansas law, Defendant's Motion to dismiss this claim is denied.

#### c. Florida

Plaintiffs Schucher, Gindele, and Wilson allege an unjust enrichment claim under Florida law. (*See* First Am. Class Action Compl., D.E. 59, ¶¶ 62–67; First Am. Class Action Compl., D.E. 62, ¶¶ 63–68.) Under Florida law, "[a] claim for unjust enrichment has three elements: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof." *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir.2012) (citing *Fla. Power Corp. v. City of Winter Park*, 887 So.2d 1237, 1241 n. 4 (Fla.2004)). "Various courts disagree as to whether the existence of an adequate legal remedy precludes a plaintiff from pleading a cause of action for unjust enrichment." *Hill v. Hoover Co.*, 899 F.Supp.2d 1259, 1268 (N.D.Fla.2012) (citing *Nichols v. Wm. Wrigley Jr. Co.*, No. 10–80759–CIV, 2011 WL 181458 (S.D.Fla. Jan. 19, 2011); *Gary v. D. Agustini & Asociados, S.A.*, 865 F.Supp. 818 (S.D.Fla.1994)); *see also Am. Honda Motor Co., Inc. v. Motorcycle Info. Network, Inc.*, 390 F.Supp.2d 1170, 1178 (M.D.Fla.2005) (stating that "to properly state a claim for unjust enrichment, a party must allege that no adequate legal remedy exists" (citing *Martinez v. Weyerhaeuser Mortg. Co.*, 959 F.Supp. 1511, 1518 (S.D.Fla.1996))). The Eleventh Circuit recently addressed this issue in a case involving a claim under the FDUTPA and an unjust enrichment claim, stating as follows:

> It is generally true that equitable remedies are not available under Florida law when adequate legal remedies exist. *Williams v. Bear Stearns & Co.*, 725 So.2d 397, 400 (Fla.Dist.Ct.App.1998). However, that rule does not apply to unjust enrichment claims. *Id.*

*State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.*, 427 Fed. Appx. 714, 722 (11th Cir.2011). The Eleventh Circuit clarified that "'[i]t is only upon a showing that an express contract exists [between the parties] that the unjust enrichment ... count fails.'" *Id.* (quoting *Williams*, 725 So.2d at 400); *see also William Ryan Homes Fla., Inc. v. Whitney Nat'l Bank*, No. 8:12–cv–1575–T–33TGW, 2012 WL 4328769, at *5 (M.D.Fla. Sept. 30, 2012) (finding that because "the parties do not contest (1) that a valid contract exists between William Ryan Homes and Whitney National Bank and (2) that the instant dispute arises out of this contractual relationship," the plaintiff could not also assert a claim for unjust enrichment). However, to the extent that a plaintiff has adequate legal remedies under theories of liability other than a claim of breach of an express contract, those remedies do not bar an unjust enrichment claim. *See State Farm*, 427 Fed.Appx. at 722.

Plaintiffs Schucher, Gindele, and Wilson have stated a claim for unjust enrichment under Florida law. Plaintiffs allege as follows:

> Plaintiff Schucher and consumers in the class states conferred upon WFC non-gratuitous payments for the DHA-fortified milk products. WFC appreciated, accepted or retained the non-gratuitous benefits conferred by Plaintiff Schucher and consumers in the class states, with full knowledge and awareness that, as a result of WFC's deceptive marketing, Plaintiff Schucher and consumers in the class states were not receiving DHA-fortified milk products of the quality, nature, fitness or value that had been represented by WFC and reasonable consumers would have expected.

> WFC profited from its unlawful, unfair, misleading, and deceptive practices and

advertising at the expense of Plaintiff Schucher and consumers in the class states, under circumstances in which it would be unjust for WFC to be permitted to retain the benefit. Under common law principles of unjust enrichment, WFC should not be permitted to retain the benefits of this unjust enrichment. Because WFC's retention of the non-gratuitous benefits conferred by Plaintiff Schucher and consumers in the class states is unjust and inequitable, Plaintiff Schucher and consumers in the class states are entitled to, and hereby seek disgorgement and restitution of WFC's wrongful profits, revenue, and benefits in a manner established by the Court. Plaintiff Schucher and consumers in the class states do not have an adequate remedy at law against WFC.

(First Am. Class Action Compl., D.E. 59, ¶¶ 64–67; *see also* First Am. Class Action Compl., D.E. 62, ¶¶ 65–68 (identical allegations by Plaintiffs Gindele and Wilson).) Plaintiffs' allegations that Plaintiffs directly conferred a benefit on WhiteWave by purchasing its DHA-fortified milk products at a premium price in reliance on White-Wave's misrepresentations that the DHA in its products "supports brain health," and that WhiteWave profited from its misrepresentations and retains those profits, are sufficient to allege the three elements of an unjust enrichment under Florida law. *See Feiner,* 2013 WL 2386656, at *5 (finding that the plaintiff's allegations that "(1) Plaintiff and Class members directly conferred a benefit on Defendant by purchasing 5–hour ENERGY® at a premium price; (2) Defendant accepted and retained the benefit in the amount of the profits it earned from sales to Plaintiff and Class members; and (3) Defendant has profited from its unlawful, unfair, misleading, and deceptive practices and advertising at the expense of Plaintiff and Class members,

under circumstances in which it would be unjust for Defendant to be permitted to retain the benefit … establish each element of a claim for unjust enrichment"). In addition, Plaintiffs have pled that there is no adequate legal remedy (*see* First Am. Class Action Compl., D.E. 59, ¶ 67; First Am. Class Action Compl., D.E. 62, ¶ 68), and Defendant does not argue that there is an express contract between the parties that precludes recovery under an unjust enrichment theory (*see* Motion 39–40). Accordingly, because Plaintiffs sufficiently pled an unjust enrichment claim under Florida law, Defendant's Motion to dismiss this claim is denied.

### 3. Breach of Express Warranty Claims

Defendants argue that Plaintiffs Auer, Sisneros, Hulsey, and Barrera's breach of express warranty claims fail because "none of the Plaintiffs allege exact terms of a warranty, or any reasonable reliance on a warranty." (Motion 39.) Defendants also argue that Plaintiffs "do not plead that any alleged warranties were breached, or how WhiteWave's products did not perform as warranted." (*Id.*) Finally, Defendant argues that Plaintiffs "Auer and Sisneros's warranty claim under Arizona law fails for the additional reason that they do not, and cannot, allege privity as between themselves and WhiteWave" because they "purchased Horizon milk from a Fry's grocery store and a Wal–Mart." (*Id.*)

#### a. Arizona

 Plaintiffs Auer and Sisneros allege a breach of express warranty claim under Arizona law. (*See* First Am. Class Action Compl., D.E. 58, ¶¶ 65–70.) Plaintiffs allege as follows:

WFC expressly warranted in its marketing campaign and, specifically, on each and every carton of its DHA-fortified milk that it "supports brain health" in

children and adults alike. The brain health representation made by WFC is an affirmation of fact that became part of the basis of the bargain and created an express warranty that the goods would conform to the stated promise. Plaintiffs and the consumers in the Class relied on WFC's brain health representation in purchasing the products. All conditions precedent to WFC's liability under this contract have been performed by Plaintiffs and the Class.

WFC breached the terms of this contract, including the express warranties, with Plaintiffs and the Class by not providing products that would support brain health as represented.

As a result of WFC's breach of its contract, Plaintiffs and the Class have been damaged in the amount of the price of the products they purchased.

(*Id.* ¶¶ 67–70.) These allegations are insufficient to state a claim for breach of express warranty under Arizona's Uniform Commercial Code ("U.C.C.") statute. "Under Arizona law, to create an express warranty, a seller must provide an 'affirmation of fact or promise,' 'a description of the goods,' or 'a sample or model' that becomes 'part of the basis of the bargain.'" *Welch v. Wright Med. Tech., Inc.,* No. CV–11–2113–PHX–DGC, 2012 WL 4711899, at *3 (D.Ariz. Oct. 3, 2012) (quoting Ariz.Rev.Stat. Ann. § 47–2313(A)). In addition, "'an express warranty claim requires a showing that the seller made an affirmation of fact or promise that became the basis of the bargain.'" *D'Agnese v. Novartis Pharm. Corp.,* 952 F.Supp.2d 880, 893, No. CV–12–00749–PHX–JAT, 2013 WL 3335203, at *10 (D.Ariz. July 2, 2013) (quoting *Mills v. Bristol–Myers Squibb Co.,* No. CV 11–968–PHX– FJM, 2011 WL 3566131, at *3 n. 3 (D.Ariz.

Aug.12, 2011)). Furthermore, a plaintiff may not proceed with "a breach of warranty action under the [Uniform Commercial Code] against a manufacturer not in privity with the plaintiff." *Rocky Mountain Fire & Cas. Co. v. Biddulph Oldsmobile,* 131 Ariz. 289, 640 P.2d 851, 856 (1982) (citing *Flory v. Silvercrest Indus., Inc.,* 129 Ariz. 574, 633 P.2d 383 (1981)). Here, Plaintiffs have failed to plead that they are in privity with White Wave; in fact, Plaintiffs have pled that they purchased White-Wave's products from a Fry's grocery store and a Wal–Mart. (*See* First Am. Class Action Compl., D.E. 58, ¶¶ 10, 11.)

■ However, Plaintiffs argue that "privity of contract is not required between a manufacturer and a retail purchaser where the claims fall outside the U.C.C." (Response 30.) Plaintiffs are correct that a "lack of privity between a manufacturer and retail purchaser does not preclude a claim outside the U.C.C. for breach of express warranty." *Seekings v. Jimmy GMC of Tucson, Inc.,* 130 Ariz. 596, 638 P.2d 210, 215 (1981) (citing *Flory,* 633 P.2d at 389–90); *see also De Shazer v. Nat'l RV Holdings, Inc.,* 391 F.Supp.2d 791, 794–95 (D.Ariz.2005) (stating that "lack of privity between a manufacturer and retail purchaser does not preclude a claim outside the U.C.C. for breach of express warranty"); *Rocky Mountain Fire,* 640 P.2d at 856 (noting that privity between a manufacturer and consumer is not required for a claim of breach of warranty under the common law, but not applying this exception because the plaintiff did not allege a common law breach of warranty claim). Plaintiffs state that their "express warranty claims fall squarely within this exception," but Plaintiffs do not explain why their claim falls within the exception.[10] (Response 30.) Plaintiffs

---

**10.** The Court notes that earlier in its response

brief, in arguing that "each statement on the

simply assert that they "did not allege a claim based on Arizona's U.C.C. statute," and therefore, "the express warranty claim is not subject to the U.C.C. and privity is not required." (*Id.*)

■ In *Flory*, the Arizona Supreme Court found that a written warranty made by the manufacturer of a mobile home to the buyers did not qualify as an express warranty under the U.C.C. because it was not made by the seller of the mobile home, but that the manufacturer's warranty may have formed a separate, enforceable contract between the manufacturer and seller. *Flory*, 633 P.2d at 390. The Court then stated that to determine whether the manufacturer's warranty constituted an enforceable contract, the lower court should consider whether there was an "offer, acceptance, consideration and sufficient specification of terms so that the parties' obligations can be determined." *Id.* (further stating that "[o]n retrial, it may be determined that [the manufacturer] made an offer to perform the terms of its 'Manufacturer's Warranty,' which [the buyers] accepted, and that sufficient specification of terms existed to determine the parties' obligations"). Here, although the complaint is not very precise, because Plaintiffs have alleged that Plaintiffs and White-Wave had a contract (*see* First Am. Class Action Compl., D.E. 58, ¶¶ 68, 69) and that "[t]he brain health representation made by WFC ... became part of the basis for the bargain," which Plaintiffs accepted by purchasing the DHA-fortified milk products (*id.* ¶ 67), the Court finds that Plaintiffs have stated a claim for breach of express warranty under Arizona common law. Accordingly, Defendant's Motion to dismiss this claim is denied.

**b. Arkansas**

■ Plaintiff Hulsey alleges a breach of express warranty claim under Arkansas law. (*See* First Am. Class Action Compl., D.E. 61, ¶¶ 72–78.) Under Arkansas law,

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

ARK.CODE ANN. § 4–2–313. "An affirmation of fact must be part of the basis of the parties bargain to be an express warranty." *Ciba–Geigy Corp. v. Alter*, 309 Ark. 426, 834 S.W.2d 136, 147 (1992) (citing *Currier v. Spencer*, 299 Ark. 182, 772 S.W.2d 309 (1989)). "When a buyer is not

---

cartons' labels are either an affirmation of fact or promise about the goods, or provide a description of the goods that became part of the basis of the bargain" constitute "express warranties," Plaintiffs cited to Arizona's statute adopting the relevant provision of the Uniform Commercial Code. (*See* Response 28 (citing ARIZ.REV.STAT. ANN. § 47–2313(A)(1)).)

influenced by the statement in making his or her purchase, the statement is not a basis of the bargain." *Id.* (citation omitted) (finding that because the buyer "did not recall reading any of the advertising materials," the buyer "was not influenced by the advertising materials when purchasing [the product], and hence they were not a basis of the bargain"). In other words, under Arkansas law, "reliance is an essential element of an express warranty claim." *Brooks v. Remington Arms Co.,* No. 1:09–cv–01054, 2010 WL 6971894, at *5 (W.D.Ark. Oct. 27, 2010) (citing *Ciba–Geigy,* 834 S.W.2d at 146–47).

Plaintiff Hulsey alleges as follows:

Section 4–2–313, Arkansas Code, provides that an affirmation of fact or promise, including a description of the goods, becomes part of the basis of the bargain and creates an express warranty that the goods shall conform to the promise and to the description.

WFC expressly warranted in its marketing campaign and, specifically, on each and every carton of its DHA-fortified milk that it "supports brain health" in children and adults alike. The brain health representation made by WFC is an affirmation of fact that became part of the basis of the bargain and created an express warranty that the goods would conform to the stated promise. Plaintiff and the Arkansas Class members placed importance on WFC's brain health representations.

Plaintiff and the Arkansas Class members have performed all conditions precedent to WFC's liability under this contract.

WFC was provided notice of the issues with the express warranties by, *inter alia,* the instant Complaint and its predecessors.

WFC breached the terms of this contract, including the express warranties, with Plaintiff and the Arkansas Class members by not providing products that would support brain health as represented.

As a result of WFC's breach of their contract, Plaintiff and the Arkansas Class members have been damaged in the amount of the price of the products they purchased.

(First Am. Class Action Compl., D.E. 61, ¶¶ 73–78.) Plaintiff's allegations that WhiteWave stated on its products' labels and in its advertisements that the DHA in its products "supports brain health," that he relied on WhiteWave's representations that the DHA in its products "supports brain health" in making his purchase, and that WhiteWave's DHA-fortified milk products do not support brain health as represented, are sufficient to state a claim for breach of express warranty under Arkansas law. *See* ARK.CODE ANN. § 4–2–313(1); *Ciba–Geigy,* 834 S.W.2d at 146–47. In addition, the Court notes that "whether a given statement constitutes an express warranty is normally a question of fact for the jury." *In re Ford Motor Co. E–350 Van Prods. Liab. Litig. (No. II),* No. 03–4558(HAA), 2008 WL 4126264, at *4 (D.N.J. Sept. 2, 2008) (citing, *inter alia, Betaco, Inc. v. Cessna Aircraft Co.,* 32 F.3d 1126, 1130 (7th Cir.1994); *Cornish v. Friedman,* 94 Ark. 282, 126 S.W. 1079, 1083 (1910)) (interpreting Section 4–2–313(1) of the Uniform Commercial Code, which Arkansas has adopted in Section 4–2–313(1) of its Annotated Code). Accordingly, because Plaintiff sufficiently pled a claim for breach of express warranty under Arkansas law, Defendant's Motion to dismiss this claim is denied.

### c. California

 Plaintiff Barrera alleges a breach of express warranty claim under California law. (*See* Second Am. Class

Action Compl., D.E. 63, ¶¶ 74–79.) Under California law, "[a]n express warranty is 'a contractual promise from the seller that the goods conform to the promise. If they do not, the buyer is entitled to recover the difference between the value of the goods accepted by the buyer and the value of the goods had they been as warranted.'" *Elias,* 950 F.Supp.2d at 1128, 2013 WL 3187319, at *4 (quoting *Daugherty v. Am. Honda Motor Co.,* 144 Cal.App.4th 824, 830, 51 Cal.Rptr.3d 118 (2006)). "[I]n order to prevail on a breach of express warranty, Plaintiff must prove that the seller: '(1) made an affirmation of fact or promise or provided a description of its goods; (2) the promise or description formed the basis of the bargain; (3) the express warranty was breached; and (4) the breach caused injury to the plaintiff.'" *Bilodeau v. McAfee, Inc.,* No. 12–CV–04589–LHK, 2013 WL 3200658, at *12 (N.D.Cal. June 24, 2013) (quoting *Keegan v. Am. Honda Motor Co., Inc.,* 838 F.Supp.2d 929, 949 (C.D.Cal.2012)). "Proof of reliance on specific promises is not required." *Elias,* 950 F.Supp.2d at 1128, 2013 WL 3187319, at *4 (citing *Weinstat v. Dentsply Int'l, Inc.,* 180 Cal.App.4th 1213, 1227, 103 Cal.Rptr.3d 614 (2010)). "A buyer must also plead that notice of the alleged breach was provided to the seller within a reasonable time after discovery of the breach." *Bilodeau,* 2013 WL 3200658, at *12 (citing *Alvarez v. Chevron Corp.,* 656 F.3d 925, 932 (9th Cir. 2011)). "[T]he notice requirement means pre-suit notice." *Alvarez,* 656 F.3d at 932. "'The buyer has the burden of showing that reasonable notice was provided.'" *Bilodeau,* 2013 WL 3200658, at *12 (quoting *Stearns v. Select Comfort Retail Corp.,* 763 F.Supp.2d 1128, 1142 (N.D.Cal.2010)); *see also Morey v. NextFoods, Inc.,* No. 10 CV 761 JM (NLS), 2010 WL 2473314, at *2

(S.D.Cal. June 7, 2010) (noting that "[i]n order to state a claim for breach of warranty, Plaintiff must allege ... [that he] took reasonable steps to notify the defendant of the alleged breach" (citing *Williams v. Beechnut Nutrition Corp.,* 185 Cal.App.3d 135, 142, 229 Cal.Rptr. 605 (1986))).

█ With regard to his breach of express warranty claim, Plaintiff alleges as follows:

> WFC expressly warranted on each and every carton of its DHA-fortified milk that it "supports brain health" in children and adults alike. The brain health statement made by WFC is an affirmation of fact that became part of the basis of the bargain and created an express warranty that the goods would conform to the stated promise. Plaintiff placed importance on WFC's brain health representation.
>
> All conditions precedent to WFC's liability under this contract have been performed by Plaintiff and the Class.
>
> WFC breached the terms of this contract, including the express warranties, with Plaintiff and the Class by not providing a product that would support brain health as represented.
>
> As a result of WFC's breach of their contract, Plaintiff and the Class have been damaged in the amount of the price of the products they purchased.

(Second Am. Class Action Compl., D.E. 63, ¶¶ 76–79.) Plaintiff provides no facts demonstrating that he gave any notice of the alleged breach to WhiteWave within a reasonable time after discovering the alleged breach or complained to WhiteWave prior to filing suit.[11] (*See id.*) Accordingly,

---

11. The Court notes that in Count II of his Second Amended Class Action Complaint, which alleges a violation of California's Con-sumers Legal Remedies Act, Plaintiff alleges as follows:

Plaintiff Barrera has failed to state a claim for breach of express warranty under California law, and Defendant's Motion to dismiss this claim is granted. *See Bilodeau,* 2013 WL 3200658, at *12 (dismissing a plaintiff's breach of express warranty claim without prejudice because she failed to plead that "she gave any notice of the alleged breach to the seller within a reasonable time after discovering the alleged breach or complained to McAfee prior to filing suit"). Plaintiff Barrera is granted leave to amend his complaint to address this pleading deficiency.

### B. "Lack of Substantiation Theory" Not Applicable

Defendant argues that Plaintiffs are proceeding under a "lack of substantiation theory," which is not actionable. (Motion 11–18.) Specifically, Defendant argues that "Plaintiffs cannot claim under the consumer protection statutes at issue based on the premise that there is a lack of 'reliable' or 'competent' scientific substantiation for WhiteWave's representation that DHA Omega–3 'supports brain health.'" (*Id.* at 11.)

Consumer claims for a lack of substantiation are not cognizable under some states' consumer fraud statutes.[12] *See, e.g., In re Clorox Consumer Litig.,* 894 F.Supp.2d 1224, 1232 (N.D.Cal.2012) (stating that "[c]onsumer claims for a lack of substantiation are not cognizable under California law"); *Stephens v. Gen. Nutrition Co.,* No. 08 C 6296, 2009 WL 1437843, at *4 (N.D.Ill. May 21, 2009) (noting that claims "based on the complete lack of scientific studies" are not cognizable under the Illinois consumer fraud statute) (citing *Gredell v. Wyeth Labs., Inc.,* 367 Ill.App.3d 287, 305 Ill.Dec. 160, 854 N.E.2d 752, 756–

---

Pursuant to section 1782 of the Act, by letter dated September 27, 2011, Plaintiff Barrera notified WFC in writing by certified mail of the particular violations of section 1770 of the Act and demanded that WFC rectify the problems associated with the actions detailed above and give notice to all affected consumers of WFC'S intent to so act. WFC failed to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to section 1782 of the Act. Therefore, Plaintiff Barrera and the CLRA subclass further seek claims for actual, punitive and statutory damages, as deemed appropriate.

(Second Am. Class Action Compl., D.E. 63, ¶ 72.) However, this allegation does not state that Plaintiff provided notice to WhiteWave of its alleged breach of the express warranty. (*See id.*) Furthermore, Plaintiff did not incorporate by reference this allegation into his breach of express warranty claim in Count III. Accordingly, the Court finds that this allegation is insufficient to plead the notice requirement for the breach of warranty claim.

12. Defendant has not cited to, and the Court has not found, any case that states that consumer claims for lack of scientific substantia-

tion are not cognizable under the consumer fraud statutes of Arizona, Arkansas, or Florida.

Defendant does argue that "pursuant to the Federal Trade Commission Act (15 U.S.C. § 45 *et seq.,* the 'FTCA'), *only* the FTC can require a manufacturer to produce evidence to substantiate its advertising claims," and that "[a] private plaintiff cannot proceed against a manufacturer on a 'lack of scientific evidence' basis inasmuch as there is no private right of action under the FTCA." (Motion 11–12.) Defendant further contends that "[i]nasmuch as the FTCA is a federal act and the FTC is a federal agency, the rationale of [two district court cases from California] applies to all Plaintiffs' claims, regardless of the particular state statute under which they are brought." (*Id.* at 12 n. 7.) However, Plaintiffs do not bring any claim under the FTCA. Moreover, Plaintiffs are not seeking to require WhiteWave to produce evidence to substantiate its advertising claims. Instead, Plaintiffs are stating that WhiteWave's advertising claims are false and that the falsity of WhiteWave's brain health representations is shown by scientific studies.

57 (2006)). Under California law, for example, "if Plaintiff is going to maintain an action against Defendant for false or misleading advertising, then Plaintiff will be required to adduce evidence sufficient to present to a jury to show that Defendant's advertising claims with respect to [the] [p]roduct are actually false; not simply that they are not backed up by scientific evidence." *Fraker v. Bayer Corp.*, No. CV F 08–1564 AWI GSA, 2009 WL 5865687, at *8 (E.D.Cal. Oct. 6, 2009).

█ However, Plaintiffs are not proceeding under a lack of scientific substantiation theory. Plaintiffs' main allegation is that WhiteWave's DHA-fortified milk products do not support brain health, and therefore, that its representations on its products' labels, on its websites, and in its advertisements that its DHA-fortified milk products "support brain health" are false. (*See, e.g.*, First Am. Class Action Compl., D.E. 58, ¶¶ 1, 2, 15, 16, 34, 37, 40–42.)[13] For example, Plaintiffs allege that "the DHA-fortified milk products do not support brain health in children or adults" and that "WFC's brain health representation is false, misleading, and reasonably likely to deceive the public." (*Id.* ¶ 2.) To support their allegation that WhiteWave's assertion that the DHA in its products "supports brain health" is false, Plaintiffs cite to "clinical cause-and-effect studies [which] have found no causative link between DHA algal oil supplementation and brain health." (*Id.*) In other words, Plaintiffs are not claiming that there is no scientific evidence to support WhiteWave's brain health representations; instead, they are claiming that the competent scientific evidence shows that WhiteWave's representations are actually false. *See In re Clorox Consumer Litig.*, 894 F.Supp.2d at 1233 (rejecting the defendant's argument that the case should be dismissed because the plaintiffs were proceeding on a "lack of substantiation theory" and finding that the plaintiffs "do more than allege that there is no competent scientific evidence to support Clorox's claims; they allege that the competent scientific evidence shows that Clorox's claims are objectively false"); *see also Cardenas v. NBTY, Inc.*, 870 F.Supp.2d 984, 994 (E.D.Cal.2012) (rejecting the defendant's argument that the case should be dismissed because the plaintiffs were proceeding on a "lack of substantiation theory" and stating that "[i]f Plaintiff's assertions are true, and 'clinical cause and effect studies have been unable to confirm a cause and effect relationship between AKBA supplementation and joint renewal or rejuvenation,' ... then it stands to reason that Defendants' representations that AKBA 'helps with joint flare-ups' are actually false"). As the Court found above, Plaintiffs' allegations that WhiteWave's brain health representations are false and that the falsity of these representations is shown by scientific studies are sufficient to allege false statements and misrepresentations under the various consumer fraud statutes at issue.

### C. Consumer Fraud Statutes' Safe Harbor Provisions Not Applicable

Defendant also argues that the "safe harbor" provisions of the applicable consumer fraud statutes bar "any claims that

---

13. All Plaintiffs make substantially similar if not identical allegations regarding the falsity of WhiteWave's representations that its DHA-fortified milk products support brain health. (*See* First Am. Class Action Compl., D.E. 61, ¶¶ 1, 2, 14, 15, 33, 36, 39–41; Second Am. Class Action Compl., D.E. 63, ¶¶ 1, 2, 14, 15, 33, 36, 37, 39–42; First Am. Class Action Compl., D.E. 59, ¶¶ 1, 2, 13, 14, 35–39, 58; First Am. Class Action Compl., D.E. 62, ¶¶ 1, 2, 14, 15, 33, 36, 39–41, 59; Second Am. Class Action Compl., D.E. 60, ¶¶ 1, 2, 14, 15, 33, 36, 39–41.)

are based on conduct compliant with, or permitted by, state or federal law or federal regulatory bodies." (Motion 21–24 (citing ARIZ.REV.STAT. § 44–1523; ARK.CODE ANN. § 4–88–101(1) & (3); FLA. STAT. § 501.212(1); 815 ILL. STAT. 505/10b(1); *Cel–Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 83 Cal.Rptr.2d 548, 973 P.2d 527, 541 (1999)).)

The "safe harbor" provisions in the consumer fraud statutes as cited by Defendant are as follows:

Arizona: "nothing contained in this article shall apply to any advertisement which is subject to and complies with the rules and regulations of, and the statutes administered by the federal trade commission." ARIZ.REV.STAT. § 44–1523. Arkansas: "This chapter does not apply to: (1) Advertising or practices which are subject to and which comply with any rule, order, or statute administered by the Federal Trade Commission; … (3) Actions or transactions permitted under laws administered by … [a] regulatory body or officer acting under statutory authority of this state or the United States." ARK.CODE. ANN. § 4–88–101(1), (3). Florida: "This part does not apply to: (1) An act or practice required or specifically permitted by federal or state law." FLA. STAT. § 501.212(1). Illinois: "Nothing in this Act shall apply to any of the following: (1) Actions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States." 815 ILL. STAT. 505/10b(1).

■ Defendant does not cite to a provision in California's consumer fraud statutes that contains a safe harbor provision. However, although courts have noted that "California's Unfair Competition Law does not itself contain a statutory safe harbor provision," *DePriest,* 351 S.W.3d at 177 (citing *Yabsley v. Cingular Wireless, LLC,* 98 Cal.Rptr.3d 657 (Cal.Ct.App.2009)), California case law recognizes a safe harbor defense to its consumer fraud statutes. Under California law, "[t]he safe harbor defense [to claims brought under the UCL or CLRA] states that 'if the legislature has permitted certain conduct or considered a situation and concluded that no action should lie, courts may not override that determination.'" *Bronson v. Johnson & Johnson, Inc.,* No. C 12–04184 CRB, 2013 WL 1629191, at *7 (N.D.Cal. Apr. 16, 2013) (quoting *Cel–Tech Commc'ns,* 83 Cal. Rptr.2d 548, 973 P.2d at 541).

Defendant contends that because "Plaintiffs' claims are based entirely on a labeling representation that has been approved by FDA and FTC," Plaintiffs' claims are barred by the safe harbor provisions of the consumer fraud statutes. (Motion 23–24.) Defendant bases its argument on letters sent by the FDA and the FTC to Defendant. (*See id.* at 7–9, 23–24.) On October 25, 2011, WhiteWave sent a letter to the FDA to respond to the FDA's "concern regarding the adequacy of WhiteWave's evidence 'to suggest that there is a relationship between DHA and brain and eye health in the targeted population,'" and in the letter, WhiteWave cited to various studies to support its brain health claims. (Defendant's Request for Judicial Notice, Ex. 1, D.E. 71–1, at 2–6.) On February 1, 2012, the FDA responded to WhiteWave's letter, stating that the "FDA has performed a cursory review of the information [WhiteWave] has submitted," and that "[b]ased on the information [WhiteWave has] provided, [the FDA] would not object at this time to the DHA claims regarding brain and eye health." (*Id.* at Ex. 2, D.E. 71–2, at 1.)

On December 13, 2011, the FTC sent a letter to WhiteWave, stating that the FTC

had "conducted an investigation of White-Wave ... for possible violations of ... the Federal Trade Commission Act," and that "the investigation concerned WhiteWave's advertising for Horizon Organic Milk with docosahexaenoic ('DHA') Omega–3." (*Id.* at Ex. 3, D.E. 71–3, at 1.) The FTC specified that its "inquiry focused on whether WhiteWave had adequate substantiation for representations that DHA improved or supported: 1) brain development or function, 2) cognitive development or function, 3) intelligence, or 4) learning abilities in children over the age of two." (*Id.*) The FTC "determined not to recommend enforcement action at [that] time" based on WhiteWave's "voluntary action to modify all advertising to ensure compliance with the FTC Act." (*Id.*) The FTC cautioned that "[t]his action is not to be construed as a determination that a violation of the law did not occur, just as the pendency of an investigation should not be construed as a determination that a violation has occurred." (*Id.* at 2.)

■■■■ These letters from the FDA and the FTC are insufficient to invoke the consumer fraud statutes' safe harbor provisions. The safe harbor provisions apply only to conduct approved or specifically authorized by law. *See Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 941 (7th Cir.2001) (stating that under Illinois law, "[i]f the parties are doing something *specifically authorized* by federal law, section 10b(1) will protect them from liability under the ICFA"); *Williams v. Wash. Mut. Bank*, No. CIV. 07–2418 WBS GGH, 2008 WL 115097, at *4 (E.D.Cal. Jan. 11, 2008) (stating that a "plaintiff cannot assert a UCL claim if a federal or state law legalizes defendant's practice" (citing *Augustine v. FIA Card Servs., N.A.*, 485 F.Supp.2d 1172, 1176 (E.D.Cal.2007))); *Prohias v. Pfizer, Inc.*, 490 F.Supp.2d 1228, 1233 (S.D.Fla.2007) (stating that

"the safe harbor statute[ ] of the consumer fraud act[ ] of Florida ... only bar[s] lawsuits challenging conduct which is specifically permitted by a federal or state regulatory scheme"). For example, the Arkansas Supreme Court found that the ADTPA's statutory safe harbor provision barred the plaintiffs' claims under the ADTPA because the "FDA is vested with the authority to approve labeling for any new drug," "the FDA regulates prescription drug advertising," the FDA specifically approved the labeling for the prescription drug Nexium, and the defendant's "advertising for Nexium is supported by FDA-approved labeling." *DePriest*, 351 S.W.3d at 173–78 (citing 21 U.S.C. §§ 352(n), 355(d)). Likewise, a Florida federal district court concluded that for some of the plaintiffs' claims under the FDUTPA, "Pfizer has not demonstrated that its conduct is protected by the relevant safe harbor provisions" because "the plaintiffs allege that Pfizer has engaged in an advertising scheme which is contrary to that sanctioned by the FDA, and does not allege that their misleading advertisements were ever approved, or even viewed by the FDA." *Prohias v. Pfizer, Inc.*, 490 F.Supp.2d 1228, 1233–34 (S.D.Fla.2007). The *Prohias* Court further found that the rest of the plaintiffs' claims under the FDUTPA were barred under the statutory safe harbor provision because the FDA approved the prescription drug "Lipitor to reduce the risk of heart attacks in patients, including women and the elderly, with multiple risk factors for coronary heart disease," "[i]ts FDA approved label specifically include[d] this indication," and "[a]ccordingly, any advertisements that stated or implied that Lipitor reduced the risk of heart disease or heart attacks simply marketed an approved use of the drug." *Id.* at 1234. The *Prohias* Court concluded that "because the claims made by Pfizer in the

post-July 2004 advertisements were implicitly authorized by the FDA, the claims in the advertisements fall within the safe harbor provision[ ] of the Florida ... consumer fraud act[ ]." *Id.*

■ Here, neither the FDA nor the FTC approved WhiteWave's labeling or advertisements in regard to the brain health representations or specifically authorized WhiteWave to make the brain health representations on its labels or in its advertising. The FDA's statement that "[b]ased on the information [WhiteWave has] provided, [the FDA] *would not object at this time to the DHA claims* regarding brain and eye health" (Defendant's Request for Judicial Notice, Ex. 2, D.E. 71–2, at 1 (emphasis added)), does not constitute approval of WhiteWave's brain health representations by the FDA. Moreover, even if the letter could be construed as approval, statements made by the FDA in a letter to a corporation about its products are insufficient to accord those statements the weight of federal law to invoke the safe harbor provisions of the consumer fraud statutes. *See Von Koenig v. Snapple Beverage Corp.*, 713 F.Supp.2d 1066, 1074–76 (E.D.Cal.2010); *see also Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 342 n. 6 (3d Cir.2009) (in an preemption analysis, "reject[ing] Snapple's arguments that a letter from a FDA official from July 2008 is entitled to weight" because "[t]he letter was not issued as part of any formal rulemaking or adjudication[,] was not subject to notice and comment[,]" and "the FDA issued the letter in response to a question from interested parties, rather than doing so in an enforcement action"). Likewise, the FTC's statement that it had "*determined not to recommend enforcement action* at this time*" (Defendant's Request for Judicial Notice, Ex. 3, D.E. 71–3, at 1 (emphasis added)), does not constitute approval of WhiteWave's representations by

the FTC. An agency's decision not to bring an enforcement action against a corporation does not constitute approval of the corporation's actions. *See Int'l Ctr. for Tech. Assessment v. Thompson*, 421 F.Supp.2d 1, 9 (D.D.C.2006) (noting that the FDA "declined to initiate enforcement proceedings against the GloFish manufacturer" and stating that the "FDA's decision not to regulate GloFish is not an agency action, but rather, an agency inaction").

Because the Court concludes that neither the FDA nor the FTC specifically approved or authorized WhiteWave to make its brain health representations, and that even if the FDA and the FTC's letters to WhiteWave could be construed as the agencies' approval of WhiteWave's brain health representations, those letters cannot be accorded the weight of federal law to invoke the safe harbor provisions, Defendant's Motion to dismiss Plaintiffs' consumer fraud claims on this basis is denied.

**D. Primary Jurisdiction Doctrine Does Not Support Dismissal**

Defendant also argues that the primary jurisdiction doctrine mandates dismissal of these actions in deference to the FDA and the FTC, the governmental agencies vested with authority over the issues presented. (*See* Motion 18–21.) Specifically, Defendant asserts that the "FDA has primary responsibility for the labeling of dietary supplements," and that the "FTC has primary responsibility for the advertising of dietary supplements." (*Id.* at 19.)

■ Primary jurisdiction "is a doctrine specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency." *Reiter v. Cooper*, 507 U.S. 258, 268, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993); *see also United States*

*v. Western Pac. R.R.*, 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956) (stating same); *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir.2008) (stating that "the doctrine is a 'prudential' one, under which a court determines that an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry, rather than the judicial branch"). "It requires the court to enable a 'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling." *Reiter*, 507 U.S. at 268, 113 S.Ct. 1213. "Referral of the issue to the administrative agency does not deprive the court of jurisdiction; it has discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." *Id.* at 268–69, 113 S.Ct. 1213; *see also Hansen v. Norfolk & W. Ry.*, 689 F.2d 707, 714 (7th Cir.1982) (stating that "[d]ismissal of the complaint may be appropriate when all of the relief that is sought in court can be obtained in an administrative forum or in an easily initiated suit subsequent to the administrative proceedings;" however, "[a] stay of the court action pending administrative determinations ... is in order when there is reason to believe that a party may be prejudiced by a dismissal" (citing *Far E. Conference v. United States*, 342 U.S. 570, 576–77, 72 S.Ct. 492, 96 L.Ed. 576 (1952); *United States v. Mich. Nat'l Corp.*, 419 U.S. 1, 5, 95 S.Ct. 10, 42 L.Ed.2d 1 (1974))).

 " '[T]he main justifications for the rule of primary jurisdiction are the exper-

tise of the agency deferred to and the need for a uniform interpretation of a statute or regulation.' " *Boyes v. Shell Oil Prods. Co.*, 199 F.3d 1260, 1265 (11th Cir. 2000) (quoting *Cnty. of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1310 (2d Cir.1990)). Accordingly, "[t]here are four factors uniformly present in cases where the doctrine properly is invoked: (1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration." *United States v. Gen. Dynamics Corp.*, 828 F.2d 1356, 1362 (9th Cir.1987) (citing *Ricci v. Chi. Mercantile Exch.*, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973); *Western Pac. R.R.*, 352 U.S. at 59, 77 S.Ct. 161; *United States v. Pac. & Atl. Ry. & Navigation Co.*, 228 U.S. 87, 33 S.Ct. 443, 57 L.Ed. 742 (1913); *United States v. Yellow Freight Sys.*, 762 F.2d 737 (9th Cir.1985)).

 Here, Defendant argues that "[t]he issue of whether and to what extent a manufacturer may claim that 'DHA Omega–3 supports brain health'—and what substantiation is required to make this claim—falls squarely within the jurisdiction of FDA." (Motion 18.) Defendant contends that because the Court would need scientific expertise to resolve the consumer fraud, unjust enrichment, and warranty claims, "the determination of whether WhiteWave's labeling and advertising claims are properly substantiated" should be left to the FDA and the FTC.[14] (*See id.*

14. Defendant argues that Plaintiffs have alleged that the labeling and advertising claims for its DHA-fortified products lack adequate scientific substantiation, and it is this issue—the substantiation of dietary supplement advertising claims—that falls within the pri-

mary jurisdiction of the FDA and FTC. However, as the Court discussed above in Part IV.B, Plaintiffs are not proceeding under a lack of scientific substantiation theory and are instead arguing that WhiteWave's brain health representations are actually false.

at 19.) However, the primary jurisdiction doctrine "is not designed to secure expert advice from agencies every time a court is presented with an issue conceivably within the agency's ambit," but instead "is to be used only if a claim requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency." *Clark*, 523 F.3d at 1114. Plaintiffs' claims rest on the determination of whether WhiteWave's brain health representations on its products' labeling, in its advertisements, and on its website are false and/or misleading and whether customers purchased WhiteWave's products in reliance on these representations. (*See* First Am. Class Action Compl., D.E. 58, ¶¶ 1, 2, 15, 16, 34, 37, 40–42.) " '[T]his is not a technical area in which the FDA has greater technical expertise than the courts—[as] every day courts decide whether conduct is misleading.' " *Rikos v. Procter & Gamble Co.*, 782 F.Supp.2d 522, 530 (S.D.Ohio 2011) (declining to apply the primary jurisdiction doctrine when the plaintiff's claims rest on the determination of whether a company's advertisements of a food supplement "are likely to deceive a reasonable consumer" under California's consumer fraud statutes) (quoting *Lockwood v. Conagra Foods, Inc.*, 597 F.Supp.2d 1028, 1035 (N.D.Cal.2009) (declining to apply the primary jurisdiction doctrine in false advertising case concerning definition and deceptive use of the term "natural")) (citing *Chacanaca v. Quaker Oats Co.*, 752 F.Supp.2d 1111, 1124 (N.D.Cal.2010) (stating that the plaintiffs advanced a "relatively straightforward claim: they assert that defendant has violated FDA regulations and marketed a product that could mislead a reasonable consumer," which "is a question courts are well-equipped to handle")).

This case is similar to *Chavez v. Nestle USA, Inc.*, where consumers alleged that a company engaged in deceptive marketing and advertising practices under the California consumer fraud statutes in connection with its Juicy Juice Brain Development beverages. No. CV 09–9192–GW(CWx), 2011 WL 2150128, at *1 (C.D.Cal. May 19, 2011), *aff'd in part & rev'd in part*, 511 Fed.Appx 606, 607 (9th Cir.2013). In that case, the plaintiffs alleged, *inter alia*, that the juices' packaging stated, "DHA—A BUILDING BLOCK FOR BRAIN DEVELOPMENT," that the company made other statements connecting DHA to brain health in its advertisements and on its website, and that the company's statements on the juices' packaging, in its advertisements, and on its website were deceptive, false, and/or misleading. *See id.* at *2. After finding that the case should be dismissed on other grounds, the district court "question[ed] whether the courtroom [was] the appropriate forum for resolving scientific disputes regarding the efficacy of the nutrients in Defendant's Brain Development ... beverages," and found that the plaintiffs' "claims regarding the presence of DHA in the Brain Development beverage would be subject to dismissal under the primary jurisdiction doctrine." *Id.* at *7. On appeal, the Ninth Circuit reversed the district court's dismissal of the plaintiffs' claims related to the defendant's Brain Development beverages and found that "[t]he primary jurisdiction doctrine does not provide an alternative basis for dismissing the Juicy Juice Brain Development claims." *Chavez v. Nestle USA, Inc.*, 511 Fed.Appx. 606, 607 (9th Cir.2013). The Ninth Circuit stated, "Where, as here, the doctrine is invoked at the motion to dismiss stage, the question is 'whether the complaint plausibly asserts a claim that would *not* implicate the doctrine.' " *Id.* (quoting *Cnty. of Santa Clara v. Astra USA, Inc.*, 588 F.3d 1237, 1252 (9th Cir. 2009), *rev'd on other grounds*, —— U.S.

——, 131 S.Ct. 1342, 179 L.Ed.2d 457 (2011)). The Ninth Circuit concluded that dismissal was not warranted on primary jurisdiction grounds because the consumers' "claims do not necessarily implicate primary jurisdiction, and the FDA has shown virtually no interest in regulating DHA in this context." *Id.*

The cases cited by Defendant are distinguishable from the facts of this case and do not support dismissal of this case on primary jurisdiction grounds. For example, in *Aaronson v. Vital Pharmaceuticals, Inc.*, the plaintiff claimed that a pharmaceutical company "disseminated, or caused to be disseminated, deceptive representations that promote the [Redline] Product as a safe and healthy dietary supplement ... but minimize, and fail to adequately warn the public of, the dangers and health risks associated with use of [Redline] or the proper dosage." No. 09–cv–1333, 2010 WL 625337, at *2 (S.D.Cal. Feb. 17, 2010). The *Aaronson* Court noted that "[a]lthough courts can resolve whether a product has been approved as safe, the question of whether a product should be approved as safe requires the FDA's expertise." *Id.* (citation omitted). The Court then applied the primary juris-

diction doctrine to the plaintiff's claim, stating that "whether Redline and/or its ingredients should be approved as safe ..., these issues are best suited for the FDA." *Id.* Here, the issue of whether the DHA Omega–3 in WhiteWave's products is "safe" is not before the Court.

As another example, in *Mutual Pharmaceutical Company v. Watson Pharmaceuticals, Inc.*, both the plaintiffs and the defendants were pharmaceutical companies that distributed a prescription drug containing the chemical colchicine as the sole active pharmaceutical ingredient. No. CV 09–5700 PA (RCx), 2009 WL 3401117, at *1 (C.D.Cal. Oct. 19, 2009). Once the plaintiff pharmaceutical companies obtained approval from the FDA to market its product exclusively for the treatment of a certain disease, they sued the defendant companies under the federal Lanham Act and the California consumer fraud statutes for falsely implying on their product's labels that the their product was approved by the FDA and safer than the plaintiffs' product. *See id.* at *1–2. In that case, the plaintiffs did "not allege that Defendants have made any literally false statements." [15] *Id.* at *2. Here, however, Plain-

15. The district court denied the plaintiffs' motion for a preliminary injunction, finding that there was not a substantial likelihood that the plaintiffs would prevail on the merits of the case for multiple reasons. The Court first stated that it was unclear whether having drugs listed on a "drug ordering system maintained by a third party even constitutes a 'false statement' in 'commercial advertising or promotion' to fall within the scope of the Lanham Act's false advertising provisions" and then noted that "there is little evidence that Defendants have in any way created the confusion experienced by pharmacists." *Mut. Pharm. Co. v. Watson Pharm., Inc.*, No. CV 09–5700 PA (RCx), 2009 WL 3401117, at *5 (C.D.Cal. Oct. 19, 2009). The Court then found that the plaintiffs' "contentions concerning the product labels and inserts are even weaker, both because the evidence of

confusion is weaker and because disputes concerning the content of those labels and inserts falls even more squarely within the primary jurisdiction of the FDA." *Id.* The Court also noted that "the doctrine of unclean hands substantially decreases the likelihood that Plaintiffs will ultimately prevail on the merits" because "the evidence indicates that almost up to the moment the commenced this action, they were engaged in precisely the same activity over which they now seek to enjoin their competitors." *Id.*

In the same order, the district court also transferred the case to another district court, which denied the defendants' motion to dismiss on primary jurisdiction grounds. *See Mut. Pharm. Co. v. Watson Pharm., Inc.*, No. 09–5421(GEB), 2010 WL 446132, at *4–5 (D.N.J. Feb. 8, 2010). The transferee court found that "the complaint alleges that defen-

tiffs have alleged that WhiteWave has made false statements about DHA and brain health on its products' labels, in its advertising, and on its website. (*See, e.g.,* First Am. Class Action Compl., D.E. 58, ¶¶ 1, 2, 15, 16, 34, 37, 40–42.)

Finally, in *Gordon v. Church & Dwight Co.,* the plaintiffs had alleged that the defendant claimed in its advertising on its products' labels that its "latex condoms [with N–9 spermicidal lubricant] help reduce the spread of sexually-transmitted diseases (including AIDS)," but that "in reality, ... exposure to N–9 can increase the risk of HIV transmission." No. C 09–5585 PJH, 2010 WL 1341184, at *1 (N.D.Cal. Apr. 2, 2010). The *Gordon* Court dismissed the plaintiffs' claims under the California consumer fraud statutes on primary jurisdiction grounds, stating that the FDA "actively regulated N–9 condoms for 30 years, under the authority granted by the Food, Drug, and Cosmetic Act of 1938," that "[t]he FDA has carried out this duty by, among other things, promulgating regulations governing the labeling of N–9 condoms, and mandating the specific substance of warnings, instructions, and statements of use," and that "[t]he FDA continues to be actively involved in monitoring and evaluating the labeling of N–9 condoms." *Id.* at *2. Here, however, as the Ninth Circuit recently noted, "the FDA has shown virtually no interest in regulating DHA in this context." *Chavez,* 511 Fed.Appx. at 607; *see also Rikos,* 782 F.Supp.2d at 530 (stating that "courts have declined to apply the primary jurisdiction doctrine when the party seek-

ing agency referral does not provide evidence that 'the FDA has actually taken any interest in investigating the claims or issues presented here'" (quoting *Pom Wonderful v. Ocean Spray Cranberries, Inc.,* 642 F.Supp.2d 1112, 1123 (C.D.Cal. 2009))).

Accordingly, because Plaintiffs' claims are within the conventional experience of the court and do not require the expertise of the FDA or the FTC, and because the Court's rulings on Plaintiffs' claims would not conflict with a statutory or regulatory scheme implemented by the FDA and/or the FTC, Defendant's Motion to dismiss Plaintiffs' claims on primary jurisdiction grounds is denied.

### E. Defendant's Motion to Strike Class Allegations is Premature

■ Defendant moves to strike the class and subclass allegations in Plaintiffs' amended complaints. (Motion 28–32, 35–37.) "The question of class certification is generally not addressed on a motion to dismiss." *Chamberlain v. Integraclick, Inc.,* No. 4:10–CV–00477–SPM–WCS, 2011 WL 2118699, at *5 (N.D.Fla. May 25, 2011) (quoting *Chaney v. Crystal Beach Capital, LLC,* No. 8:10–cv–1056–T–30TGW, 2011 WL 17639, at *2 (M.D.Fla. Jan. 4, 2011)). "While class allegations may be stricken at the pleading stage, motions to strike class allegations are generally disfavored because 'a motion for class certification is a more appropriate vehicle.'" *Seifi v. Mercedes–Benz USA, LLC,* No. C12–5493 TEH, 2013 WL 2285339, at *8 (N.D.Cal. May 23, 2013) (citing *Kamm v. Cal. City*

---

dants affirmatively misrepresented the FDA approval status of their products and also made false and misleading representations on their product inserts," and "[w]hether these statements are false and misleading to relevant consumers is not a matter reserved for the FDA, but a matter that falls within the jurisdiction of this Court." *Id.* at *5. The

Court further noted that "[t]he resolution of plaintiffs' Lanham Act claims do not depend on any rule or regulation of the FDA, but rather whether defendants' products misleadingly imply FDA approval," concluding that "[f]or this reason, the portion of defendants' motion to dismiss that rests on the primary jurisdiction doctrine will be denied." *Id.*

*Dev. Co.,* 509 F.2d 205, 212 (9th Cir.1975)) (quoting *Thorpe v. Abbott Labs., Inc.,* 534 F.Supp.2d 1120, 1125 (N.D.Cal.2008)). Because Plaintiffs have not yet filed a motion for class certification, the Court will not make a determination regarding class certification at this time, and the Court denies Defendant's motion to strike the class and subclass allegations in Plaintiffs' amended complaints.

## V. Conclusion

Accordingly it is **ORDERED AND ADJUDGED** that, as consistent with this Order:

1. Defendant's Motion to Dismiss Plaintiffs' Amended Complaints Pursuant to F.R.C.P. 12, or, in the Alternative, Strike Class Allegations (D.E. 68), filed on August 16, 2012, is **GRANTED IN PART AND DENIED IN PART;**

2. Count III of the *Barrera* Second Amended Class Action Complaint (D.E. 63) is **DISMISSED WITHOUT PREJUDICE;**

3. Plaintiffs shall file the complaint from the *English* action on the MDL docket by August 9, 2013;

4. Plaintiffs shall file any amended complaint in *Barrera* action and on the MDL docket by August 16, 2013;

5. Defendant shall respond or file its answers to the amended complaints, including the complaint filed in the *English* action, by September 6, 2013;

6. Because the Court did not refer to the exhibit attached to Plaintiff's Request for Judicial Notice in making its findings, Plaintiffs' Request for Judicial Notice (D.E. 84), filed on September 18, 2012, is **DENIED AS MOOT;** and

7. Because the Court did not refer to the exhibits attached to Defendant's Request for Judicial Notice in Support of Reply Brief in making its findings, Defendant's Request for Judicial Notice in Support of Reply Brief (D.E. 86), filed on September 28, 2012, is **DENIED AS MOOT.**